STANDARD CONSTRUCTORS, INC., Appellant,

v.

CHEVRON CHEMICAL COMPANY, INC., Appellee.

No. 01–00–01250–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Feb. 26, 2003.

Rehearing Overruled March 28, 2003.

Roger Townsend, Hogan Dubose & Townsend, L.L.P., Houston, for Appellant.

Collyn A. Peddie, Jeffrey Parsons and Jeff Nobles, Beirne, Maynard & Parsons, L.L.P., Houston, for Appellee.

Panel consists of Justices HEDGES, JENNINGS, and MIRABAL.*

## OPINION

TERRY JENNINGS, Justice.

In this breach of contract action, appellant, Standard Constructors, Inc. (Standard), challenges a judgment entered after a jury verdict in favor of appellee, Chevron Chemical Company, Inc. (Chevron). In three issues, Standard contends that the trial court erred in (1) ruling, as a matter of law, that the contract unambiguously barred Standard's claim for "equipment overtime charges," (2) excluding relevant evidence, and (3) awarding Chevron interest and attorneys' fees. We affirm.

### Factual Background and Procedural History

Standard, a construction company specializing in work at petrochemical plants, provided construction, maintenance, and repair services at Chevron's Cedar Bayou refinery from the mid–1970s to 1997, when Chevron terminated its last contract with Standard. Standard had worked for Chevron under a series of one-year contracts, but, in December 1994, the parties entered into a three-year contract, which is the subject of this suit. Chevron entered into the three-year contract with Standard in order to lock in Standard's rates for personnel and equipment.

A few weeks before the new contract took effect, the refinery was severely damaged by a flood, and Standard was responsible for rebuilding approximately 33 buildings on an emergency basis. During the repairs, Chevron conducted a routine audit of Standard's billing. The initial audit revealed that Standard had overcharged Chevron $97,784 for employee overtime. Standard admitted to overcharging Chevron and agreed to repay Chevron for its mistake. However, after completing the audit, Chevron claimed that Standard owed Chevron a total of $531,424, which included the $97,784 and, by letter dated December 18, 1996, Chevron demanded payment from Standard. Standard did not pay on Chevron's demand, and Chevron terminated the contract.

Standard subsequently sent Chevron a bill for $647,666, claiming that from April 1994 through March 1996 it failed to charge Chevron for "equipment overtime" and that under the three-year contract, Chevron was responsible for the these charges. Chevron refused to pay on Standard's demand.

Standard then sued Chevron for (1) the equipment overtime, (2) its lost profits from the premature termination of its exclusive contract, and (3) its attorneys' fees. Chevron counterclaimed for breach of contract, demanding $97,784 as damages, and its attorneys' fees.[1]

---

* The Honorable Margaret G. Mirabal, former Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

1. In its counterclaim, Chevron originally al-

Before the trial began, the trial court held an evidentiary hearing on the issue of the contract's ambiguity. The trial court ruled that the contract was unambiguous and barred Standard's claim for equipment overtime charges. The remaining issues were tried to a jury. The jury determined that Standard did not have an exclusive contract and awarded Chevron $97,784 in overcharges and $80,000 in attorneys' fees. The trial court then rendered judgment on the verdict and added prejudgment and post-judgment interest.

## Contract Interpretation

In its first issue, Standard contends that the trial court erred in ruling, as a matter of law, that the three-year contract unambiguously barred Standard's claim for the previously unbilled equipment overtime.

Whether a contract is ambiguous is a question of law for the court to decide. *See Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex.1996); *see also Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex.1995); *Markert v. Williams*, 874 S.W.2d 353, 356 (Tex.App.-Houston [1st Dist.] 1994, writ denied). We review questions of law *de novo*. *See generally El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.*, 8 S.W.3d 309, 312 (Tex.1999); *MCI Telecomm. Corp. v. Texas Util. Elec. Co.*, 995 S.W.2d 647, 651 (Tex.1999); *Tex. Private Employment Ass'n v. Lyn–Jay Int'l, Inc.*, 888 S.W.2d 529, 531 (Tex.App.-Houston [1st Dist.] 1994, no writ).

The determination of whether a contract is ambiguous is made by looking at the agreement as a whole in light of the circumstances present when the parties entered into the contract. *Nat'l Union*, 907 S.W.2d at 520. We examine and consider

leged that Standard owed Chevron a total of $531,424, which included the previously discovered $97,784. However, prior to trial,

the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Id.* No single provision will control; rather, all the provisions must be considered with reference to the whole instrument. *Id.*

The primary concern of a court when construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. *Id.* If a written contract is worded in a way that it can be given a definite or certain legal meaning, then it is not ambiguous. *Id.* A contract will only become ambiguous if its meaning is uncertain or it is subject to two or more reasonable interpretations. *Id.* An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract. *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex.1994).

Chevron contends that the trial court did not err in ruling that the contract unambiguously precluded Standard from charging overtime for equipment used during its construction and maintenance work. Conversely, Standard contends that the trial court erred in so ruling because the terms of the contract, specifically Exhibit "F," are ambiguous and that overtime charges for equipment are permitted under the agreement.

The contract provides, in pertinent part, as follows:

[Chevron] shall pay [Standard] a compensation in accordance with attached Terms and Conditions, Exhibit "B" entitled "Compensation Schedule", and Exhibit "F" entitled "Contractor Owned Equipment".

Chevron non-suited its claim for $433,640, leaving only $97,784 at issue.

Exhibit "F" was prepared by Standard and is a six-page list of different types of equipment with corresponding billing rates in a format, reproduced in part, as follows:

### EXHIBIT "F"

### CONTRACTOR—OWNED EQUIPMENT

| Equipment Name | Hourly (1) | Daily (8) | Weekly (40) | Monthly (176) |
|---|---|---|---|---|
| AIR COMPRESSOR | N/A | $ 35.00 | $140.00 | $420.00 |
| AIR COMPRESSOR 100–600CFM | N/A | $150.00 | $450.00 | N/A |
| AIR DRILL | N/A | $ 20.00 | $ 60.00 | $180.00 |
| AIR HOSE | N/A | $ 10.00 | $ 30.00 | N/A |
| AIR IMPACT WRENCH 3/4″ | N/A | $ 24.00 | $ 79.00 | $169.00 |
| AIR NAIL GUN | N/A | $ 40.00 | $120.00 | $360.00 |
| AIR SPADE | N/A | $ 12.00 | $ 16.00 | $ 24.00 |
| APPLIANCE DOLLY (HAND MULE) | N/A | $ 12.25 | $ 36.75 | $110.25 |
| AUGER–GAS POWERED 12″ | N/A | $100.00 | $300.00 | $900.00 |
| BACKHOE–HITACHI 270 | $38.00 | N/A | N/A | N/A |
| BACKHOE–RUBBERTIRE 580K&E | $25.00 | N/A | N/A | N/A |

For each piece of equipment, the chart provides a column for an "Hourly (1)," "Daily (8)," "Weekly (40)," and "Monthly (176)" rate charge. Under the hourly column, no hourly rate is specified for the vast majority of the equipment listed. Where no such rate is specified in the hourly column, the term "N/A" is used.[2] For example, in regard to ladders, the hourly column contains the term "N/A," the daily column reads "$17.95," the weekly column reads "$53.85," and the monthly column reads "$161.55." In some instances, a rate is specified in the hourly column, but the term "N/A" is used in the daily, weekly, and monthly columns. For example, in regard to a "Backhoe–Hitachi 270," the hourly column provides a rate of "$38.00," but the term "N/A" is used in the daily, weekly, and monthly columns.

Chevron contends that the term "N/A," as it is used in the contract, "clearly dem-onstrates [the parties'] intention that hourly rates were not to be applied—or charged—for those items with an 'N/A' in their 'hourly' rate column, whether that hourly rate would have been for 'straight' time or for 'overtime.'"

On the other hand, Standard contends that the abbreviation "N/A" should be interpreted to mean variable or dependant. Standard argues that, because the contract is silent regarding whether it could charge overtime for equipment, the contract is ambiguous on its face and the abbreviation "N/A" means something other than its natural definition.

In support of its argument, Standard notes that the construction industry has general practices that govern the rental rates of equipment. Standard directs us to the Associated Equipment Distributors' (AED) *Green Book,*[3] which sets forth rent-

---

**2.** The parties agree that "N/A" stands for "not applicable."

**3.** THE AED GREEN BOOK, COMPILATION OF NATIONALLY AVERAGED 1995 RENTAL RATES & MODEL SPECIFICATIONS FOR CONSTRUCTION EQUIPMENT (47th ed.1996) [hereinafter "GREEN BOOK"].

al rates for various types of equipment used in the construction industry. Standard maintains that the *Green Book* explains how construction companies, like Standard, can charge for overtime use of equipment.

The *Green Book* is extrinsic evidence which was not expressly incorporated into the parties' contract. In Texas, extrinsic evidence is not admissible to contradict or vary the meaning of unambiguous language in a written contract and may not be considered by this Court in order to create an ambiguity. *Nat'l Union*, 907 S.W.2d at 521–22 (holding evidence of industry-wide discussions inadmissible to demonstrate intent behind unambiguous absolute pollution exclusion); *Sears, Roebuck and Co. v. Commercial Union Ins. Corp.*, 982 S.W.2d 151, 154 (Tex.App.-Houston [1st Dist.] 1998, no pet.). Rather, an "ambiguity must become evident when the contract is read in context of the surrounding circumstances, *not after parol evidence of intent is admitted to create an ambiguity.*" *Nat'l Union*, 907 S.W.2d at 521 (emphasis added). Only after a contract is first determined to be ambiguous may this Court then consider the parties' interpretations, through extrinsic evidence, of the contract. *See Friendswood Dev. Co. v. McDade + Co.*, 926 S.W.2d 280, 283 (Tex. 1996) (holding only after contract is found to be ambiguous may parol evidence be admitted for purpose of ascertaining parties' true intentions).

Here, a plain reading of the contract demonstrates the parties' intention that Chevron was not to be charged an hourly rate for Standard's use of equipment listed in Exhibit "F" with a "N/A" in its hourly column. In its brief, Standard concedes that:

> On its face, [Exhibit "F"] simply provides fixed rates for Standard's equip-

ment classified as "[H]ourly," "[D]aily," "[W]eekly," and "[M]onthly." The "Daily" column has an "(8)" next to the word "Daily," which represents an 8–hour day. Similarly, the "(40)" in the "Weekly" column and the "(176)" in the "Monthly" column represent a 40 hour week and a 176–hour month. *Therefore, the daily rate was based upon an 8–hour day, the weekly rate was based upon a 40–hour week, and the monthly rate was based upon a 176–hour month. . . . That much of the contract is indeed unambiguous.*

(Emphasis added.) In regard to the use of equipment during regular hours, Chevron would be charged $17.95 for the daily use of a ladder, based on an 8 hour day, but it would not be charged for the hourly use of a ladder. The contract does not become ambiguous in regard to the rates for overtime use of equipment merely because it does not, on its face, address "overtime."

It makes sense that one might consent to paying $38.00 an hour for the use of a backhoe, but would be unwilling to pay for the use of a ladder on an hourly basis. It also makes sense that some types of equipment, like a backhoe, may be available for use only on an hourly basis and that the parties would agree that rates for daily, weekly, and monthly use would not be applicable. It makes no sense that the term "N/A" under the daily, weekly, and monthly columns for a backhoe would be subject to only one meaning, i.e., "no rate charge," but under the hourly column for a ladder could be subject to two interpretations, i.e., "no rate charge" for use during regular hours or "variable rate charge" in regard to overtime use.

The dissenting opinion agrees with Standard's argument that the term "N/A" should be interpreted in conjunction with the numbers (1), (8), (40), and (176), which appear at the top of Exhibit "F." The

dissent points out that, in the *Green Book,* the numbers (8), (40), and (176) have a distinct meaning within the construction industry and quotes the *Green Book* regarding a calculation to be used in assessing charges for the overtime use of rental equipment. It concludes that the *Green Book*'s interpretation of the numbers (8), (40), and (176), as they were used in Exhibit F, supports Standard's construction that would allow it to charge overtime for equipment usage and, thus, the contract is subject to two reasonable interpretations.

However, as noted above, extrinsic evidence, such as the *Green Book,* is not admissible to contradict or vary the meaning of unambiguous language in a written contract and it will not be considered by this Court in order to create an ambiguity. *Nat'l Union Fire Ins.,* 907 S.W.2d at 521–22. Nevertheless, the *Green Book* provided in the record simply does not discuss hourly rates or the term "N/A." Nor does the *Green Book* discuss numbers as placed beside the terms "Daily," "Weekly," and "Monthly" or suggest that such placements manifest an intent that the contracting parties have agreed to special compensation for overtime use of equipment. In fact, the very language quoted by the dissenting opinion as demonstrating an ambiguity in the contract applies to situations where "the equipment is rented."[4] Exhibit "F" is entitled "CONTRACTOR-OWNED EQUIPMENT."

▌ Whatever the substance and meaning of the provisions of the *Green Book,* the parties in this case chose the language used in the contract.[5] Standard prepared Exhibit "F" and chose to use the term "N/A." If Standard meant that the rates for hourly overtime use of certain types of

equipment to be "variable," it could have used that term or an asterisk with a simple explanation. A contract is not ambiguous merely because a party believes the contract does not mean what it actually says.

The term "N/A" has one clear, plain meaning *throughout* the chart labeled Exhibit "F"—"no rate charge"—and is not ambiguous. Thus, we hold that the trial court did not err in ruling that the contract unambiguously barred Standard's claim for payment for overtime use of equipment on an hourly basis.

We overrule Standard's first issue.

### Exclusion of Evidence

In its second issue, Standard contends that the trial court erred in excluding relevant evidence. During Standard's bill of exception, Bob Gulledge, Standard's president, testified that Richard Weaver, a Chevron representative, told him that Chevron had forced him to fabricate its original claim for $531,424 in order to offset Standard's claim for equipment overtime charges. Specifically, Gulledge stated,

> He [Weaver] told me that he just wanted to let me know before he left that the $531,000—that the bulk of, that $531,000 was not owed to Chevron—I mean, not owed by us to Chevron.... He just said the bulk of it was thrown in there to counteract equipment.

Chevron objected to Gulledge's testimony on the grounds that it was irrelevant and any probative value was outweighed by its potential prejudicial effect. *See* Tex.R. Evid. 401, 402, 403. Standard argues that this "admission" was relevant to

4. Green Book, *supra* at 3.

5. We note that the *Green Book* advises its readers as follows: "To avoid disagreements

... the terms [of a contract] should be spelled out in a written agreement...." *Id.*

show why it was excused from repaying Chevron the $97,784.

The decision to exclude evidence is reviewed under an abuse of discretion standard. *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex.1995). A court abuses its discretion only when it acts in an unreasonable and arbitrary manner, or when it acts without reference to any guiding rules and principles. *E.I. du Pont de Nemours and Co., Inc. v. Robinson,* 923 S.W.2d 549, 558 (Tex.1995); *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). This Court may not reverse a trial court's ruling for an abuse of discretion merely because we disagree with its decision. *See Robinson,* 923 S.W.2d at 558; *Downer,* 701 S.W.2d at 242.

■ In addition to showing an abuse of discretion, Standard must also show that the trial court's error was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment. *See* TEX.R.APP. P. 44.1; *see also Alvarado,* 897 S.W.2d at 753–54; *GT & MC, Inc. v. Tex. City Ref., Inc.,* 822 S.W.2d 252, 257 (Tex. App.-Houston [1st Dist.] 1991, writ denied). In other words, the "judgment [must] turn[ ] on the particular evidence excluded." *Alvarado,* 897 S.W.2d at 753–54.

■ Here, Gulledge's testimony was not relevant to Standard's claim that it was "excused" from reimbursing $97,784 to Chevron. The pertinent jury question read as follows:

> Do you find from a preponderance of the evidence that on or before February 19, 1997, Standard was excused from repayment to Chevron of the $97,784 over-billing?

6. On appeal, Standard does not challenge either the wording or the submission of this

> You are instructed that Standard's failure to repay the $97,784 *was excused only if you find* that Chevron *clearly indicated to Standard that any tender of repayment by Standard of $97,784 would be refused.*

Answer "Yes" or "No" in the space below.

Answer: <u>NO.</u>

(Emphasis added.) [6]

Gulledge's proffered testimony was irrelevant to the issue before the jury. Evidence is only relevant if it has "any tendency to make the existence of any fact *that is of consequence to the determination of the action* more probable or less probable than it would be without the evidence." TEX.R. EVID. 401 (emphasis added). Here, even if Gulledge's testimony was true, it would not have provided Standard with a legal "excuse," as defined by the jury charge, to forego reimbursing $97,784 to Chevron. As noted above, Chevron originally alleged that Standard owed Chevron a total of $531,424. However, Chevron non-suited its claim for $433,640, leaving only its claim for the $97,784 reimbursement. Thus, the issue of whether Chevron created a bogus bill for $433,640 is irrelevant to the current litigation. As noted by the trial court,

> But he acknowledges—Mr. Gulledge acknowledges that—he did acknowledge that *the same portion was going to include the $97,000 was, in fact, appropriate for payment.* And so, what you're asking me to let the jury hear is a conversation pursuant to which Mr. Weaver is apparently saying that we have, in effect, a bogus bill. *It doesn't help us* with that part of the bill [the

question.

$97,784], the charges that aren't [unsubstantiated].

(Emphasis added.)

We hold the trial court did not abuse its discretion in excluding, as irrelevant, Gulledge's proffered testimony as indicated above.

We overrule Standard's second issue.

### Attorneys' Fees and Interest

In its third issue, Standard argues that the trial court erred in awarding Chevron attorneys' fees and prejudgment interest because Chevron made no pretrial demand on Standard specifically for reimbursement of the $97,784 in overcharges for overtime, and Chevron's initial demand for payment of $531,424 was excessive and made in bad faith. Standard also contends that post-judgment interest should be deleted from the judgment.

***Attorneys' Fees***

In order to recover attorneys' fees under chapter 38 of the Civil Practice and Remedies Code, a claimant must comply with the following requirements:

(1) the claimant must be represented by an attorney;

(2) the claimant must *present* the claim to the opposing party or to a duly authorized agent of the opposing party; and

(3) payment for the just amount owed must not have been tendered before the expiration of the 30th day after the claim is *presented.*

TEX. CIV. PRAC. & REM.CODE ANN. § 38.002 (Vernon 1997) (emphasis added); *Hermann Hosp. v. Vardeman,* 775 S.W.2d 866, 868 (Tex.App.-Houston [1st Dist.] 1989, no writ). No particular form of demand or presentment is required. *Jones v. Kelley,* 614 S.W.2d 95, 100 (Tex.1981); *Adams v. Petrade Int'l, Inc.,* 754 S.W.2d 696, 719

(Tex.App.-Houston [1st Dist.] 1988, writ denied).

▮▮▮ Standard argues that "because Chevron never demanded the $97,784 until trial began, Standard had no chance to avoid litigation." However, in a letter dated December 18, 1996, Chevron presented Standard with a demand for payment of $531,424. It is undisputed that Chevron's claim for reimbursement of $97,784 for overtime overcharges was included as part of that demand. Bob Gulledge, Standard's president, described the December 18th demand as "a one-page letter ... saying that we owed them [Chevron] $531,000," and stated that he refused to pay the amount because there was no substantiation for it. As noted above, section 38.002 does not require any particular form of presentment; all that is necessary is that a party show that its assertion of a debt or claim and a request for compliance was made to the opposing party, and the opposing party refused to pay the claim. *Panizo v. Young Men's Christian Ass'n of the Greater Houston Area,* 938 S.W.2d 163, 168 (Tex.App.-Houston [1st Dist.] 1996, no writ). Thus, Standard's argument that it was never properly presented with Chevron's demand is without merit.

▮▮▮ Standard next contends that Chevron was precluded from recovering attorneys' fees and prejudgment interest because Chevron's demand was excessive and made in bad faith. As a general rule, a creditor who makes an excessive claim upon a debtor is not entitled to attorneys' fees for subsequent litigation required to recover the debt. *Findlay v. Cave,* 611 S.W.2d 57, 58 (Tex.1981). A claimant is not required to make a presentment for the exact amount it is entitled to recover at trial. *Panizo,* 938 S.W.2d at 169. The dispositive question in determining whether a demand is excessive is whether the

claimant acted unreasonably or in bad faith. *Id.*

■■■ Standard argues that Chevron's demand was unreasonable and made in bad faith because (1) its supervisor of purchasing contracts told Bob Gulledge that its claim for $531,424 was fabricated to offset Standard's claim, and (2) Chevron never provided supporting documentation for its demand. In essence, Standard is arguing that Chevron, as a matter of law, was precluded from recovering attorneys' fees and prejudgment interest. However, there was no jury finding that Chevron acted in bad faith. From the record before us, we cannot conclude that Chevron's conduct in making its initial demand of $531,424 and subsequently proceeding to trial solely on its claim for $97,784 constituted bad faith as a matter of law.[7]

■■■ Additionally, a party must affirmatively assert excessive demand as a defense to a claim for attorneys' fees. *Essex Crane Rental Corp. v. Striland Constr. Co., Inc.,* 753 S.W.2d 751, 758 (Tex.App.-Dallas 1988, writ denied); *Tuthill v. Southwestern Pub. Serv. Co.,* 614 S.W.2d 205, 212 (Tex.App.-Amarillo 1981, writ ref'd n.r.e.). Furthermore, that party must request and obtain findings of facts on the essential elements of excessive demand. *Essex,* 753 S.W.2d at 758; *Tuthill,* 614 S.W.2d at 212. Standard has failed to do both.

### Post–Judgment Interest

■■■ Finally, Standard argues that Chevron should not receive post-judgment interest because Standard was "willing to tender payment of the entire $97,784" to Chevron after the judgment was signed. However, the record demonstrates that

Standard never actually tendered payment of the $97,784 to Chevron or deposited that amount into the registry of the trial court in lieu of an appeal bond. *See* TEX.R.APP. P. 24.1, 24.2. Thus, Standard's argument is without merit.

We overrule Standard's third issue.

### Conclusion

We affirm the judgment of the trial court.

Justice MARGARET G. MIRABAL dissenting.

MARGARET G. MIRABAL, Justice, dissenting (Assigned).

I respectfully dissent. In my opinion, the trial court erred in ruling that, as a matter of law, the contract in question barred appellant's claim for payment for overtime use of equipment on an hourly basis. Accordingly, we should sustain appellant's first issue and reverse and remand this case for a new trial.

### Analysis

It is clear from the contract that Exhibit "F" is an alphabetical list of the different types of equipment Standard could use during its construction and maintenance work, and that it breaks down the rates Standard can charge for each type of equipment into four categories, which include, "Hourly (1)," "Daily (8)," "Weekly (40)," and "Monthly (176)." (Emphasis added.) In some instances, the parties agreed to assign certain types of equipment a "daily," "weekly," and "monthly" rate, and in others, the parties assigned only "hourly" rates. This is undisputed.

---

7. Moreover, Standard did not argue to the trial court that Gulledge's testimony that Chevron's representative told him that its claim for $531,424 was fabricated was relevant on the issue of making a bad faith demand.

However, for a majority of the types of equipment, the parties inserted the abbreviation "N/A," or "not applicable," in the "hourly" column. Chevron argues that the term "N/A," as it is used in the contract, demonstrates the parties' intention that hourly rates were not to be charged for those items with an "N/A" in their "hourly" rate column, whether that hourly rate would have been for "straight" time or for "overtime." Standard contends that the abbreviation "N/A" should be interpreted in conjunction with the numbers (1), (8), (40), and (176), which appear at the top of Exhibit "F." Standard claims that the contract permits charges for the overtime use of equipment, regardless of the term "N/A," because the applicable overtime rates will depend entirely on how long a particular piece of equipment is used.

In support of its argument, Standard points to the construction industry's general standards and trade practices in order to define what the term "N/A" means in connection with the numbers (1), (8), (40), and (176). The Associated Equipment Distributor's (AED) *Green Book*,[1] which sets forth rental rates for all types of equipment used in the construction industry, was admitted into evidence at the pretrial hearing. The *Green Book* is a nationally publicized information booklet that compiles the general industry practices of thousands of construction companies in the United States and Canada.

According to the *Green Book*, the numbers (8), (40), and (176) have a distinct meaning within the construction industry. The *Green Book* states that "[i]t is the general practice in the industry to base rates upon one shift of 8 hours per day, 40 hours per week, or 176 hours per month of

a 30–day consecutive period."[2] This explanation gives the numbers at the top of Exhibit "F" a definite meaning and supports Standard's interpretation of the contract.

In addition, the *Green Book* establishes a general practice in the construction industry that companies normally charge for overtime use of equipment. Specifically, the *Green Book* provides as follows:

> If the equipment is rented by the **day,** the rate for overtime is one-eighth of the daily rate for each hour in excess of eight. If it is rented by the **week,** the rate for overtime is 1/40 of the weekly rate for each hour in excess of 40. If it is rented by the **month,** the overtime rate is 1/176 of the monthly rate for each hour in excess of 176 hours in any one 30–day consecutive period.[3]

Chevron put on evidence that, during the three years before this contract, when Chevron and Standard operated under a similar contract, Standard had never charged Chevron for overtime use of equipment. Standard responded with evidence that the overtime use of equipment never came up until the flood of October 1994, which severely damaged Chevron's plant and required rebuilding on an emergency basis under the contract at issue.

Extrinsic evidence may "be admissible to give the words of a contract a meaning consistent with that to which they are reasonably susceptible, i.e., to 'interpret' contractual terms." *Mescalero Energy, Inc. v. Underwriters Indem. Gen. Agency, Inc.,* 56 S.W.3d 313, 320 (Tex.App.-Houston [1st Dist.] 2001, pet. denied) (quoting *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 521 (Tex.1995)). "[A] special-

---

1. The AED Green Book, Compilation of Nationally Averaged 1995 Rental Rates & Model Specifications for Construction Equipment (47th ed.1996) [hereinafter "Green Book"].

2. *Id.* at 3.

3. *Id.*

ized industry or trade term may require extrinsic evidence of the commonly understood meaning of the term within a particular industry." *Mescalero Energy,* 56 S.W.3d at 320; *see also Nat'l Union,* 907 S.W.2d at 521 n. 6 (holding extrinsic evidence may be considered when interpreting meaning of terms used in particular "place, vocation, trade, or industry"). Courts may refer to extrinsic evidence such as industry dictionaries to determine the commonly understood meaning of an industry term. *Mescalero Energy,* 56 S.W.3d at 323. Many courts have used expert definitions to determine the meaning of specialized terms before deciding whether an instrument is ambiguous. *Id.*

In this case, the *Green Book's* interpretation of the numbers (8), (40), and (176), as they were used in Exhibit "F," supports Standard's construction of the parties' contract that would allow it to charge for overtime use of equipment. I would hold that the contract is therefore subject to two reasonable interpretations. Thus, the trial court erred in ruling, as a matter of law, that the contract unambiguously barred Standard's claim for equipment overtime charges. This error probably caused the rendition of an improper judgment, and therefore is reversible error. *See* Tex.R.App. P. 44.1(a).

Accordingly, I would sustain Standard's first issue and not reach the merits of the remaining issues.

### Conclusion

I would reverse the judgment and remand the case to the trial court.