264 S.W.3d 786 (2008)
EDASCIO, L.L.C., Appellant,
v.
NEXTIRAONE L.L.C., Appellee.
No. 01-07-00362-CV.
Court of Appeals of Texas, Houston (1st Dist.).
May 22, 2008.
Rehearing Overruled July 21, 2008.
*787 D. Scott Funk, James J. Ormiston, Looper, Reed & McGraw, P.C., Houston, *788 TX, Stephen G. Tipps, Jennifer Kingaard, Baker Botts L.L.P., Houston, TX, for Appellant.
Sean Gorman, LeBoeuf, Lamb, Greene & MacRae, L.L.P., James E. Doyle, Doyle, Resptrepo, Harwin & Robbins, LLP, Houston, TX, for Appellee.
Panel consists of Chief Justice RADACK and Justices JENNINGS and BLAND.

OPINION
TERRY JENNINGS, Justice.
Appellant, Edascio, L.L.C. ("Edascio"), challenges the trial court's entry of a judgment notwithstanding the verdict in favor of appellee, NextiraOne L.L.C. ("NextiraOne"), in Edascio's suit against NextiraOne for breach of contract. In a single issue, Edascio contends that the trial court erred in rendering the judgment notwithstanding the verdict on the ground that "the profits that Edascio would have earned under a sales outsourcing agreement, but for NextiraOne's breach of that very agreement, were `indirect, special, or consequential damages' and thus barred under the limitation of liability clause in the contract." In four cross-issues, NextiraOne contends that the parol evidence rule barred evidence of a purported oral agreement on which Edascio based its breach of contract claim, there was no evidence to support the jury's damages award, the trial court impermissibly commented on the weight of the evidence in question one of the jury charge, and the trial court erred in submitting questions two and four of the jury charge.
We conclude that the parol evidence rule barred the introduction of the evidence on which Edascio based its breach of contract claim and on which the jury awarded Edascio damages and, thus, that the trial court did not err in granting NextiraOne judgment notwithstanding the verdict. We therefore affirm the trial court's second corrected final judgment ("final judgment") that Edascio take nothing by its suit against NextiraOne.

Factual and Procedural Background
As alleged in its fourth amended counterclaim, Edascio entered into negotiations to provide sales outsourcing services to NextiraOne, a provider of voice and data telecommunication services. NextiraOne allegedly represented that it would assign to Edascio all of its customer accounts "having fewer than 200 telephone/data ports" on an exclusive basis and that the commissions earned on sales to these accounts would be sufficient to allow Edascio to make a profit. On September 26, 2002, in reliance upon these representations, Edascio entered into a Sales Outsourcing Agreement ("SOA") with NextiraOne.
Edascio asserted that NextiraOne breached the SOA by, among other things, failing to assign all of its customer accounts with fewer than 200 ports, not assigning Edascio any accounts until two months after the required date, and assigning "less than half of the customer accounts" that NextiraOne represented it would assign.
Edascio tried its breach of contract claim to a jury.[1] The SOA, which was introduced into evidence at trial, provided that NextiraOne "desire[d] to engage Edascio to solicit orders for NextiraOne's products and services through an outsourced sales force pursuant to the terms and conditions of the SOA." During trial, and on appeal, the parties focused on certain *789 provisions of the SOA, which we set forth below.
In regard to the accounts that were to be serviced by Edascio pursuant to the SOA, the SOA did not identify any specific accounts by name or category, but instead the SOA generally provided,
1.1 "Account(s)" or "Customers" shall mean those pre-existing NextiraOne accounts or customers to which Edascio shall be assigned or which Edascio shall procure pursuant to this Agreement. NextiraOne reserves the right to provide only such Account information to Edascio that is directly related to Customers assigned to Edascio in the Territory (as defined below).

1.2 "Authorized Products and Services" shall mean those NextiraOne products and services which NextiraOne grants Edascio the right to market and sell to Accounts in the Territory (as defined below). The Authorized Products and Services shall include, but not be limited to, the list of products and services attached to this Agreement as Appendix 1.
....
1.15 "Territory" shall mean the NextiraOne Accounts indicated on the attached Appendix 5. The Territory shall not include any of the NextiraOne customers, sites, locations, or those of their affiliates and subsidiaries (the "Excluded Accounts") attached to this Agreement as Appendix 5. The Territory may be expanded or reduced after the Effective Date by mutual agreement of the parties.

(Emphasis added).
Appendix 5, attached to the SOA, did not identify any specific customer accounts and was largely blank. Appendix 5 stated only,
Appendix 5
Excluded Accounts
The attached list of NextiraOne customers are excluded from Edascio Territory. Any branch, subsidiary or affiliated company of any account on this list is also excluded from Edascio. This list will be updated quarterly to reflect new account additions.
No additional lists were attached to Appendix 5 or to the SOA. However, as discussed in more detail below, the parties agreed at trial that certain accounts were in fact transferred electronically and assigned by NextiraOne to Edascio in December 2002, several months after the effective date of the SOA.
Paragraph 5.1 of the SOA required Edascio to "employ and retain Sales Representatives to solicit and market the Authorized Products and Services in the Territory." More specifically, paragraph 5.2 required Edascio "to employ a minimum of twelve (12) Sales Representatives within (90) days of the Effective Date" of the SOA.
Section 9 of the SOA set forth detailed commission terms. Paragraph 9.1 provided that "[a]s compensation for soliciting and procuring Orders pursuant to this Agreement, NextiraOne shall pay Edascio a commission for the sale of Authorized Products and Services." Paragraph 9.2 provided that NextiraOne shall pay Edascio a percentage of the pricing margin "for all sales of Authorized Products and Services to Customers and Net New Customers in the Territory."
Paragraph 15.3 of the SOA contained a limitation of liability clause, which provided,
15.3 Limitation of Liability. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY INDIRECT, SPECIAL, *790 OR CONSEQUENTIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOSS OF PROFITS OR REVENUE, OR COMMISSIONS OR ANTICIPATED COMMISSIONS, OR EXPENDITURES, INVESTMENTS, OR COMMITMENTS MADE IN CONNECTION WITH THIS AGREEMENT, WHICH ARISE OUT OF ANY ACTION, WHETHER SOUNDING IN TORT OR IN CONTRACT, BECAUSE OF ANY PERFORMANCE OR FAILURE TO PERFORM, ANY OBLIGATION UNDER THIS AGREEMENT, OR FOR TERMINATION OF THIS AGREEMENT FOR ANY REASON. This Section 15.3 shall survive termination of this Agreement for any reason.
Finally, Paragraphs 18.2 and 18.12 of the SOA provided,
18.2 Agreement Prevails. The terms and conditions of this Agreement shall govern all transactions between the Parties and, to the extent of any conflicts or inconsistencies between this Agreement and its Exhibits, Appendices and Attachments, this Agreement shall control.
18.12 Entire Agreement. This Agreement represents the entire agreement between the parties and supersedes all prior written and oral representations. No amendment to this Agreement shall be effective unless it is in writing, dated subsequent hereto, refers explicitly to this Agreement and is signed on behalf of NextiraOne and Edascio by their duly authorized representatives.
The SOA did not expressly provide that NextiraOne was assigning all of its customers with fewer than 200 ports to Edascio. Rather, as stated in its pleadings, Edascio's suit against NextiraOne was based on Edascio's contention that the SOA "was not a fully integrated contract" as the SOA did "not address one of the most important aspects of the dealthe identity of the customers that NextiraOne was obligated to assign to Edascio." Edascio asserted that it was "necessary to look outside the [SOA] to determine which customers were subject to the [SOA], i.e., it [was] necessary to refer to the parties' oral agreement, consistent with NextiraOne's representations, that NextiraOne would promptly assign to Edascio all accounts for customers having telecommunications systems with fewer than 200 ports."[2]
At trial, James Button, Edascio's owner, testified that he had previously been employed as the Chief Operating Officer of TIC Enterprises, another sales outsourcing business, and that NextiraOne had initially contacted TIC about outsourcing its sales operations to TIC for its customers who had fewer than 200 ports. In the course of its negotiations, NextiraOne represented that the total number of these *791 accounts to be assigned numbered approximately 45,000. On April 26, 2002, Button learned that TIC's parent company intended to sell TIC, and Button immediately called NextiraOne's president, Rick Snyder, with whom Button had been working on behalf of TIC regarding the proposed sales outsourcing agreement. Button informed Snyder that, although TIC might be sold, he intended to acquire the assets of TIC, form a new company, and continue discussions with NextiraOne regarding the proposed sales outsourcing agreement. Button contended that, from this point forward, he was negotiating on behalf of a newly formed business that he would subsequently incorporate in September 2002 and name Edascio.
Button stated that at a meeting in May 2002, NextiraOne showed him a hard copy of a list of "small and medium sized customers having fewer than 200 ports" that NextiraOne intended to assign to Edascio. Button did not recall the number of customers identified on this hard copy list, but he maintained that the volume "was consistent with what we had been told before that meeting." Button agreed that he did not receive a copy of this list and that, to his knowledge, no one at Edascio had ever seen that list again. However, Button maintained that during the course of his negotiations, Snyder had represented that NextiraOne would assign Edascio "all of [its] customers with fewer than 200 ports," except for "major and national account groups that [it] would put on Exhibit 5 [to the SOA] as exclusions to the electronic data that they would give us." Button stated that Edascio had relied on these representations in planning its business operations.
Button further testified that, on September 20, 2002, Snyder sent two originals of the SOA to Button for execution. Snyder told Button that Appendix 5, as well as other appendices, were not completed yet. Snyder also stated that he would attach the appendices after he executed the originals of the SOA and would send one of the originals with the appendices back to Button. Pursuant to Snyder's instructions, Button executed the originals of the SOA and returned them to Snyder, but when Snyder returned a fully executed original of the SOA to Button, the appendices were still not complete and Appendix 5 "was blank." Button stated that he did not have any concerns about this because, despite the plain terms of Paragraph 1.15 of the SOA, it was his understanding that Appendix 5 was to provide only the "exclusions from the list" of assigned customers that NextiraOne was "going to electronically transfer to [Edascio]."
When asked if Snyder had told him when NextiraOne was going to actually assign the customer base to Edascio, Button said that Snyder told him that "the GBS customers would be coming in a couple of days" and that it was his impression that "the Staples customers" would be assigned in a few weeks.[3] When asked whether Edascio and NextiraOne had any discussions about whether the assigned accounts would be listed in the appendix to the SOA, Button stated that it would not have been practical to attach this information in Appendix 5 because it involved tens of thousands of customers and their contact information. Rather, Button stated *792 that "[w]hat ended up happening was [NextiraOne] electronically transferred that data of the accounts that [NextiraOne] did assign to us ... on a [computer disc]." Although Button agreed that NextiraOne did send the "accounts that they eventually assigned to [Edascio] electronically," Edascio argued that NextiraOne had not complied with the SOA because the electronically transferred accounts did not reflect the quantity or quality of the accounts that NextiraOne had previously represented would be assigned. However, these representations did not appear within the four corners of the SOA.
In regard to the accounts that were actually assigned, Button stated that he had first learned, in a November 2002 e-mail from NextiraOne employee Gary Bartkus, that Edascio would be receiving approximately 23,000 accounts, which he contended "was half the number [of 45,000 accounts] that [Edascio] had been told [it was] going to get." Button stated that he was "very concerned" after receiving this e-mail. Although NextiraOne, on December 2, 2002, provided Edascio with a list of 22,368 accounts, Button explained that Edascio could only sell to 18,477 of these accounts because the remaining accounts were identified as major and national accounts. Button also complained that, of these accounts, only 10,228 included phone numbers and only 11,880 had "port counts." Button agreed that NextiraOne had subsequently assigned Edascio another 4,000 accounts, and thus, during the course of the SOA, NextiraOne actually had assigned Edascio approximately 22,000 accounts.
Button testified that NextiraOne had breached the SOA in a number of ways. For example, Button asserted that NextiraOne had assigned Edascio accounts of poor quality, retained the higher quality accounts for its own internal sales force,[4] failed to assign Edascio the accounts on an exclusive basis, failed to provide Edascio with the necessary support and customer information, failed to timely pay Edascio commissions, and, most importantly, failed to assign Edascio all of its small and medium sized customers with less than 200 ports.[5]
Button also testified that no one at NextiraOne had communicated to him NextiraOne's position that the SOA did not obligate NextiraOne to assign Edascio any accounts. However, on cross-examination, Button conceded that during negotiations he had suggested including that the approximate number of accounts to be assigned was 45,000, but this term was not included in the final draft of the SOA.[6]
*793 In contrast to Button's testimony, Rick Snyder testified that, by July 2002, the proposed sales outsourcing deal (initially between NextiraOne and TIC) had died, but that Button had subsequently approached him regarding the proposed sales outsourcing agreement on behalf of Button's new company. Snyder explained that the SOA was structured to allow NextiraOne the flexibility of reviewing its customer database and assigning a list of any accounts it desired to Edascio. Although Snyder agreed that "all along" the parties had discussed a line of demarcation between an Edascio account and a direct NextiraOne account as being "200 phones," Snyder stated that the distinguishing of accounts was later made on a product-by-product basis. He explained that NextiraOne had retained complete discretion to carve out any customers it wanted to keep for itself.
Gary Bartkus, the NextiraOne employee responsible for the administration of the SOA, testified that NextiraOne entered into the SOA "to fill holes in [NextiraOne's] distribution and provide [Edascio] with accounts to work where [NextiraOne] did not have people on the accounts." Bartkus explained that at the time NextiraOne entered into the SOA, it knew it was "going to give Edascio customers," but "not exactly every single customer to the detail." Bartkus further explained that, under the SOA, NextiraOne could have elected to assign zero customer accounts to Edascio and that the SOA allowed NextiraOne to scrub its small to medium sized customer accounts and to retain certain of those accounts internally. Bartkus agreed that, at the time the SOA was executed, NextiraOne was aware that Appendix 5 was blank and NextiraOne intended to "finalize and actually list some customer accounts on Appendix 5," but he agreed that NextiraOne never did. On May 19, 2003, NextiraOne terminated the SOA after informing Edascio that it was not meeting its sales expectations.
At the conclusion of trial, the trial court submitted question number one to the jury, which provided,
Did NextiraOne and Edascio agree that Edascio's "Territory" under the Sales Outsourcing Agreement included the following customer accounts?
....
A. All GBS customer account sites with fewer than 200 ports, except those listed on Appendix 5?
B. All Staples customer account sites with fewer than 200 ports, except those listed on Appendix 5?
In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.
To find that an agreement exists, you must find that the parties agreed on all essential terms of the agreement. The essential terms of the agreement are the parties' most important considerations without which the parties would not intend to have an agreement.
The jury found that NextiraOne and Edascio had agreed that Edascio's Territory under the SOA included all GBS and Staples "customer account sites with fewer than 200 ports, except for those listed on Appendix 5." The jury further found that NextiraOne had failed to comply with the SOA, including the terms as found by the jury to have existed in question number *794 one, i.e., the terms that NextiraOne had agreed to assign all customer account sites with fewer than 200 ports. The trial court then asked the jury to consider Edascio's damages, and the trial court instructed the jury to consider only "[t]he amount of commissions NextiraOne agreed to pay Edascio, if any, resulting from the below referenced sales, less any expenses that would have been incurred by Edascio in performing its obligations under the [SOA]." The jury found, "with a reasonable degree of certainty," that NextiraOne had agreed to pay Edascio $3,155,052 in commissions (less expenses) from sales to GBS customers, $771,638 in commissions (less expenses) from sales to Staples customers, and $516,170 in commissions (less expenses) for "self-generated" sales, for a total of $4,442,860 in damages.
The jury necessarily based its damages award on the testimony of Edascio's damages expert John Camp. Camp stated that he was retained by Edascio to calculate "the commissions that were due Edascio under the [SOA] with NextiraOne," assuming that "NextiraOne performed under the contract and assigned all the customers that Edascio believe[d] should have been assigned," which were NextiraOne's "customers [with] less than 200 [ports]." Camp then deducted Edascio's expenses that he calculated would have been associated with the enlarged, assigned customer base. From these numbers, he determined the amount of Edascio's "lost profit." Camp agreed that he could not determine exactly what would have been paid to Edascio under the SOA and that his calculations assumed that NextiraOne had assigned all of its customers with less than 200 ports to Edascio. Camp stated that "quite a bit [of the] commission calculation" was based on "actual sales by NextiraOne to their [sic] customer base" that Edascio believed should have been assigned to it and that, in producing his calculations, he relied "most heavily" on NextiraOne's actual sales data. However, Camp's calculations also included an amount for "self-generated" sales, which consisted of sales that could have been achieved by Edascio had NextiraOne assigned Edascio the accounts to which Edascio believed it was entitled. These commissions were not tied to actual sales made by NextiraOne. Camp concluded that Edascio had been damaged in the amount of $4.6 million based on commissions (less expenses) that Edascio would have earned had NextiraOne assigned Edascio the customer base to which Edascio believed it was entitled.[7]
NextiraOne moved for a judgment notwithstanding the verdict, arguing that Edascio's damages were barred by the SOA's limitation of liability clause in the SOA because the recovery of commissions, anticipated commissions, and lost profits were barred by the SOA. NextiraOne also asserted that Edascio's damages were based on a legally incorrect measure of damages, Edascio provided no evidence of damages, and the parol evidence rule barred consideration of the parties' alleged oral agreement regarding the customer *795 base to be assigned. In its second corrected final judgment, the trial court granted NextiraOne judgment notwithstanding the verdict "solely on the ground[ ] that Edascio's damages proved at trial [were] indirect, special, or consequential damages barred by Section 15.3 of the [SOA]." The trial court denied NextiraOne's judgment notwithstanding the verdict on all other grounds.

Standard of Review
A trial court may grant a motion for judgment notwithstanding the verdict if a directed verdict would have been proper. TEX.R. CIV. P. 301. We review a trial court's granting of a judgment notwithstanding the verdict under a legal sufficiency standard, viewing the evidence and inferences in the light most favorable to the jury's finding. City of Keller v. Wilson, 168 S.W.3d 802, 807, 823 (Tex.2005) (stating that "the test for legal sufficiency should be the same for summary judgments, directed verdicts, judgments notwithstanding the verdict, and appellate no-evidence review"). We will sustain the granting of a judgment notwithstanding the verdict based on "no evidence" when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the trial court is barred by the rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is not more than a scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. Id. at 810.
When a trial court specifies the ground upon which it is granting a judgment notwithstanding the verdict, an appellant need only challenge the ground relied upon by the trial court. Voskamp v. Arnoldy, 749 S.W.2d 113, 118 (Tex.App.-Houston [1st Dist.] 1987, writ denied); see also Swink v. Alesi, 999 S.W.2d 107, 111-12 (Tex.App.-Houston [14th Dist.] 1999, no pet.).[8] However, the appellee may assert on appeal the grounds that it alleged in its motion for judgment notwithstanding the verdict, but not relied upon by the trial court, to attempt to vitiate the jury's verdict. Voskamp, 749 S.W.2d at 118; TEX. R.APP. P. 38.2(b) (providing that when trial court renders judgment notwithstanding the verdict "the appellee must bring forward by cross-point any issue or point that would have vitiated the verdict or that would have prevented an affirmance of the judgment if the trial court had rendered judgment on the verdict."); TEX.R. CIV. P. 324(c) (stating that when judgment notwithstanding verdict is rendered, appellee "may bring forward by cross-point contained in his brief filed in the Court of Appeals any ground which would have vitiated the verdict or would have prevented an affirmance of the judgment had one been rendered by the trial court in harmony with the verdict, including although not limited to the ground that one or more of the jury's findings have insufficient support in the evidence or are against the overwhelming preponderance of the evidence as a matter of fact....").

Parol Evidence
In its first cross-issue, NextiraOne contends that the parol evidence rule barred evidence of the purported oral agreement on which Edascio based its breach of contract claim. NextiraOne asserts that the oral agreement Edascio sought to enforce *796 at trial, which obligated NextiraOne to assign Edascio a specific category and number of accounts (approximately 45,000 accounts described during trial as NextiraOne's small and medium sized customers with fewer than 200 ports and the GBS and Staples accounts) on the effective date of the SOA, contradicted, varied, and supplemented the express terms of the SOA. NextiraOne further asserts that the alleged oral agreement violated the SOA's merger clause, in which the parties objectively manifested their intent to conclude a complete agreement and to bar any oral agreements. Edascio responds that the term "Territory" in the SOA was ambiguous, and it argues that the SOA was incomplete because it failed to identify the customers to be assigned. Thus, Edascio asserts that parol evidence was permissible to resolve the ambiguity and complete the SOA. Edascio also asserts that the existence of a merger clause does not eliminate the "facial ambiguity and incompleteness exceptions to the parol evidence rule."
The parol evidence rule is a rule of substantive contract law, and we review parol evidence questions de novo. Baroid Equip., Inc. v. Odeco Drilling, Inc., 184 S.W.3d 1, 13 (Tex.App.-Houston [1st Dist.] 2005, pet. denied); City of Pasadena v. Gennedy, 125 S.W.3d 687, 691 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). When the parties have concluded a valid, integrated agreement, the parol evidence rule precludes enforcement of a prior or contemporaneous inconsistent agreement. Ledig v. Duke Energy Corp., 193 S.W.3d 167, 178 (Tex.App.-Houston [1st Dist.] 2006, pet. denied); Baroid Equip., Inc., 184 S.W.3d at 13. A written instrument presumes that all prior agreements relating to the transaction have been merged into it and will be enforced as written and cannot be added to, varied, or contradicted by parol testimony. Baroid Equip., 184 S.W.3d at 13. The parol evidence rule "is particularly applicable when the written contract contains a recital that it contains the entire agreement between the parties or a similarly-worded merger provision." Id. When parol evidence is determined to be inadmissible, it has no legal effect and merely constitutes proof of facts that are immaterial and inoperative. Id.
However, parol evidence is admissible to show the parties' true intentions if the writing is ambiguous. Ledig, 193 S.W.3d at 178-79; Gonzalez v. United Bhd. of Carpenters and Joiners of America, Local 551, 93 S.W.3d 208, 211 (Tex. App.-Houston [14th Dist.] 2002, no pet.). The determination of whether the terms of a contract are ambiguous is a question of law, which we review de novo. Bowden v. Phillips Petroleum Co., 247 S.W.3d 690, 705 (Tex.2008); Standard Constructors, Inc. v. Chevron Chemical Co., 101 S.W.3d 619, 622 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). To determine whether a contract is ambiguous, we look at the agreement as a whole in light of the circumstances present when the parties entered into the contract. Enter. Leasing Co. of Houston v. Barrios, 156 S.W.3d 547, 549 (Tex.2004). We examine and consider the entire writing in an effort to harmonize and to give effect to all the provisions of the contract so that none will be rendered meaningless. Seagull Energy E & P, Inc. v. Eland Energy, Inc., 207 S.W.3d 342, 345 (Tex.2006).
Our primary concern in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. Id. If a written contract is worded in such a way that it can be given a definite or certain legal meaning, then the contract is not ambiguous. SAS Inst., Inc. v. Breitenfeld, 167 S.W.3d 840, 841 (Tex.2005). A contract will become ambiguous only if its meaning is uncertain or if it is subject to two or more reasonable interpretations. *797 Seagull Energy, 207 S.W.3d at 345. An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract. Tex. Farm Bureau Mut. Ins. Co. v. Sturrock, 146 S.W.3d 123, 126 (Tex.2004). Moreover, we may not consider extrinsic evidence to contradict or to vary the meaning of unambiguous language in a written contract in order to create an ambiguity. See Fiess v. State Farm Lloyds, 202 S.W.3d 744, 747 (Tex.2006).
Here, the SOA required NextiraOne to pay Edascio a commission on certain sales to "Customers" in the "Territory." The SOA provided that Edascio's "Territory" included the "NextiraOne Accounts indicated on the attached Appendix 5," but would also "not include any of the NextiraOne customers, sites, locations, or those of their affiliates and subsidiaries (the "Excluded Accounts") attached to this Agreement as Appendix 5." The SOA further provided that the "Territory" could be "expanded or reduced after the Effective Date by mutual agreement of the parties." At the time the parties executed the SOA, Appendix 5 was largely blank and referenced only an "attached list" of customers that would be excluded from the "Territory." Although there was no list attached to the Appendix at the time the SOA was executed, Appendix 5 further stated that the list would "be updated quarterly to reflect new account additions."
Edascio argues that the definition of Territory was ambiguous because the SOA stated that Appendix 5 listed both the included and excluded accounts to be assigned by NextiraOne. Edascio also seizes on the fact that Appendix 5 was blank, referred to an attached list that did not exist (at least at the time the SOA was executed), and referred only to a list of excluded accounts. Because of this alleged ambiguity, Edascio argues that the trial court correctly permitted it to introduce parol evidence to show that it had reached an oral agreement with NextiraOne that NextiraOne would assign to Edascio all of NextiraOne's small to medium sized customers with less than 200 ports and, even more specifically, all of its GBS and Staples customers with fewer than 200 ports.
We conclude that the definition of Territory in the SOA was neither internally inconsistent nor ambiguous. Rather, the SOA expressly stated that Appendix 5 would identify the accounts to be assigned by NextiraOne and included Edascio's Territory as well as the "customers, sites, locations, or those of their affiliates and subsidiaries" to be excluded from Edascio's Territory.[9] The facts that Appendix 5 was left largely blank on the effective date of the SOA and that it referred to excluded accounts did not create an ambiguity. In fact, the SOA itself expressly envisioned that Edascio's "Territory" would be "expanded or reduced after the Effective Date by mutual agreement of the parties," and Appendix 5 also provided for quarterly updates to reflect new account additions.
The SOA plainly provided the parties with flexibility both as to the identity and number of accounts to be assigned as well as the dates on which the accounts could be assigned. For example, although Edascio contends that this preexisting, agreed upon assigned customer base was effective *798 from "day one" of the SOA, nothing in the SOA obligated Edascio to have employed or hired sales representatives on the effective date of the SOA. Rather, Paragraph 5.2 of the SOA required Edascio only "to employ a minimum of twelve (12) Sales Representatives within ninety (90) days of the Effective Date," and also generally required Edascio to employ and retain an adequate number of sales representatives. Nothing in the SOA indicates that, immediately on or shortly after the effective date of the SOA, NextiraOne was required to assign to Edascio all of its small and medium sized customers with less than 200 ports, which allegedly numbered approximately 45,000. A requirement for NextiraOne to assign this category and number of accounts would seem at odds with the SOA and with the undisputed fact that Edascio, which was a newly formed company, continued to hire its sales representatives well after the SOA's effective date.
Enabled by parol evidence, Edascio sought to enforce an agreement that significantly varied and contradicted the SOA. Edascio's purported agreement was much more favorable to Edascio than the actual deal negotiated by the parties as evidenced by the SOA. As noted by NextiraOne, the agreement Edascio alleges to have made would have required NextiraOne to assign "a specific category and number of accounts," when the SOA contained no such obligation. Contrary to Edascio's parol evidence, the SOA simply indicated that NextiraOne would assign Edascio accounts and that these accounts would be identified in writing in the attached Appendix 5. On the effective date of the SOA there was no list of identified, assigned accounts. Rather, the SOA expressly contemplated that such a list could be provided and updated at various times in the future throughout the parties' business relationship. Furthermore, the SOA expressly provided that expanding or reducing the Territory in the future could only be accomplished by "mutual agreement" and that any amendments to the SOA had to be in writing.
It is undisputed that NextiraOne did, pursuant to the SOA, electronically forward to Edascio a list of approximately 18,000 accounts within three months of the execution of the SOA. NextiraOne subsequently forwarded Edascio another 4,000 accounts, for a total of 22,000 accounts assigned under the SOA. In fact, Button testified that it was his understanding that the list of assigned accounts would be "electronically transferred to [Edascio]," that attaching a hard copy of all of the accounts to be assigned to Appendix 5 would not have been practical because of the bulk of the information, and that "[w]hat ended up happening was [NextiraOne] electronically transferred that data of the accounts that they did assign to us... on a [computer disc]."
It is also undisputed that, even with all of its concerns about the quality and quantity of the accounts assigned, Edascio attempted to make sales to the customers identified in the electronically transferred accounts. In fact, Edascio earned, and was paid, commissions under the terms of the SOA on at least some of the sales it made to these assigned customers.[10] Thus, Edascio's position is not that NextiraOne wholly failed to provide it with a list of assigned accounts, which might have been a violation of the plain terms of the SOA. Rather, Edascio asserts that it was entitled to all NextiraOne accounts that fell within a specific category. However, none of these terms appear anywhere in the SOA or in any agreed upon lists or amendments provided after the effective date of the SOA.
*799 Other provisions in the SOA further support the conclusion that the SOA was neither internally inconsistent nor ambiguous. See Seagull Energy, 207 S.W.3d at 345 (noting that Court must examine and consider entire writing in effort to harmonize and give effect to all provisions of contract). First, Paragraph 15.3, the Limitation of Liability Clause, precludes the parties' recovery of indirect, special, or consequential damages, including "anticipated commissions." This language plainly prohibits Edascio from seeking damages for commissions it may have anticipated in entering into the SOA. Although Edascio may have expected the assignment of a specific number or category of accounts and, thus, may have anticipated commissions on these accounts, the preclusion of recovery for anticipated commissions in the limitation of liability clause is consistent with the plain language of the SOA providing NextiraOne with discretion in assigning specific accounts under the SOA. Allowing Edascio to introduce parol evidence to greatly expand the type and number of accounts to be assigned, and then allowing Edascio to recover as damages commissions it anticipated earning on the accounts it expected to be assigned would eviscerate the protections provided NextiraOne in the Limitation of Liability Clause. Second, Paragraph 18.12 provided that the SOA represented the parties' entire agreement and superseded all prior written and oral representations. Paragraph 18.12 also required that any amendments to the SOA be in writing, refer explicitly to the SOA, and be signed on behalf of NextiraOne and Edascio by their duly authorized representatives. See Baroid Equip., 184 S.W.3d at 13 (noting that parol evidence rule "is particularly applicable" when contract has merger clause).
Edascio also contends that the SOA is not only ambiguous, but is also incomplete. In support of its argument that parol evidence may be used to supplement the SOA, Edascio cites Magnolia Warehouse & Storage Co. v. Davis & Blackwell, 108 Tex. 422, 195 S.W. 184 (1917) and Bob Robertson, Inc. v. Webster, 679 S.W.2d 683 (Tex.App.-Houston [1st Dist.] 1984, no writ). In Magnolia Warehouse & Storage, a contract to excavate and transport dirt provided that the contractor agreed to "furnish the tools, appliances and labor necessary to excavate the earth ... and transport the same to points that have been indicated." 108 Tex. at 425, 195 S.W. at 185 (emphasis added). Noting that this contract "clearly indicate[d] that the parties had agreed upon the points to which the earth should be carried," and that "such points were not named in the written contract," the court concluded that "parol testimony was admissible to locate these points which had been agreed upon as indicated." Id. Unlike the contract in Magnolia Warehouse & Storage, the SOA did not clearly indicate that the parties had agreed to the specific accounts to be assigned.
Bob Robertson is also substantively distinguishable because it involved a claim brought by a consumer against an auto dealership under the Texas Deceptive Trade Practices Act specifically for the dealership's representations that a purchase agreement conferred or involved rights, remedies, or obligations which it did not have or involve, namely a delivery date of a truck. 679 S.W.2d at 686-87. In allowing the consumer to introduce evidence that he was to have the truck delivered in ten weeks, the court noted that the Texas Business and Commerce Code provided that "[d]elivery under a contract, where no time has been agreed upon, must be within a reasonable time" and that the contract referred to delivery numerous times, but contained no delivery date. Id. at 687.
*800 Here, although the SOA referred to accounts and customers, the SOA plainly stated that the assigned accounts would be those indicated in Appendix 5. As all parties were aware, Appendix 5 was largely blank at the time of the execution of the SOA, and the SOA expressly contemplated that Edascio's Territory could be expanded or reduced by mutual agreement in the future. The fact that the SOA granted the parties flexibility as to the identity and number of accounts to be assigned as well as the dates on which those accounts could be assigned did not allow Edascio to introduce evidence, contrary to the SOA, that the parties had orally agreed, both before and after the execution of the SOA, to a specific customer base, which appears nowhere in the SOA or in any amendments thereto.
Accordingly, we hold that the parol evidence rule barred evidence that NextiraOne agreed to assign Edascio all of its GBS and Staples customer accounts with less than 200 ports. Because Edascio sought damages solely on the basis that NextiraOne breached the SOA by failing to assign all of its GBS and Staples customers with fewer than 200 ports, we further hold that there is no evidence to support the jury's verdict and damages award and, thus, that the trial court did not err in granting NextiraOne judgment notwithstanding the verdict. We affirm the trial court's final judgment that Edascio take nothing by its suit against NextiraOne.
We sustain NextiraOne's first cross-issue.

Conclusion
Having sustained NextiraOne's first cross issue, we need not consider Edascio's single issue in which it contends that the trial court erred in rendering the judgment notwithstanding the verdict on the ground that "the profits that Edascio would have earned under a sales outsourcing agreement, but for NextiraOne's breach of that very agreement, were `indirect, special, or consequential damages' and thus barred under the limitation of liability clause in the contract." We also need not consider NextiraOne's three remaining cross-issues. We affirm the trial court's final judgment that Edascio take nothing by its suit against NextiraOne.
NOTES
[1] The jury found that NextiraOne did not commit fraud, and Edascio does not appeal the jury's finding on its fraud claim.
[2] This quotation is taken from Edascio's pleading, but, on appeal, Edascio stresses that it was not "seeking to enforce the terms of an oral agreement." Edascio now argues that the SOA was "not fully integrated because it [was] incomplete" and that "because the SOA is facially ambiguous and incomplete, it cannot be completely integrated." Edascio further argues that the SOA is incomplete and ambiguous because the term "Territory" is susceptible to several reasonable, contradictory interpretations. NextiraOne replies that Edascio has taken "a decidedly different position" on appeal and that, at trial, Edascio's position was that the parties reached an oral agreement outside the four corners of the SOA.
[3] The "GBS" and "Staples" accounts were identified as the two categories of the small and medium sized accounts held by NextiraOne. Edascio contended at trial that NextiraOne had represented that it would assign both of these categories, consisting of approximately 45,000 customers, to Edascio. However, Button conceded that, around the time that the SOA was executed, he was made aware that NextiraOne was experiencing contractual problems with the Staples customers and that NextiraOne could not immediately assign these customers.
[4] Edascio claimed that the accounts it received were "unassigned accounts," which constituted the accounts remaining after NextiraOne had "scrubbed" and "cherry picked" the list of its small and medium sized customers that were originally to be assigned to Edascio and retained the higher quality accounts for its internal sales force.
[5] Edascio took the position at trial that, under the SOA, NextiraOne had agreed to pay Edascio commissions from "day one on all sales to [the assigned] customer base," i.e., all of NextiraOne's customers with less than 200 ports. Thus, Button contended that, from the inception of the SOA, Edascio was entitled to receive a commission for any sales made to a small to medium sized customer with less than 200 ports, even if the sale was made by a NextiraOne representative.
[6] In its reply brief, Edascio makes the distinction that Button did not attempt to insert the number of accounts to be assigned45,000 into the definition of "Territory" in Paragraph 1.15 of the SOA, but rather attempted to insert this number into Section 5 of the SOA, which concerned the number of sales representatives to be hired by Edascio. Edascio concedes that the specific number of accounts to be assigned was deleted from the SOA, but asserts that the record does not reflect why the number was deleted. Edascio contends that the deletion of this term did not affect the definition of Territory in the SOA. Despite Edascio's assertion that the record does not reflect why the number was deleted, Rick Snyder specifically testified at trial that NextiraOne would not accept that term in the SOA.
[7] Camp noted that Edascio was not seeking as damages the commissions that Edascio contended were due it under the SOA for sales that Edascio actually made under the SOA. Rather, Camp's calculations were based on his projection that Edascio could have made approximately 43 million in sales to the assigned customer base that included all of NextiraOne's accounts with less than 200 ports. Camp explained that this amount was based on the assumption that these sales were "reasonable" and "achievable" by Edascio (as opposed to the $747,000 in actual sales made by Edascio under the SOA). Camp agreed that the amount of 43 million in sales was a combination of NextiraOne's actual sales plus what he assumed Edascio would have sold to the assigned customer base and to new customers.
[8] See also Fort Bend County Drainage Dist. v. Sbrusch, 818 S.W.2d 392, 394 (Tex.1991) (noting that when party moves for judgment notwithstanding verdict on multiple grounds and trial court grants judgment notwithstanding verdict without specifying which ground it found decisive, appellant has burden of showing that judgment notwithstanding verdict was not proper on any of asserted grounds).
[9] The SOA plainly indicated that Appendix 5 would list, in the general sense, both included and excluded accounts. NextiraOne notes that paragraph 1.15 can be "harmonized quite easily" because the first sentence referred to the NextiraOne accounts to be assigned and the second sentence referred to NextiraOne customers, sites, and locations to be excluded. As noted by NextiraOne, simply indicating that a document "will accomplish two purposes" does not create an ambiguity.
[10] Edascio is not pursuing, as damages, the small amount of commissions that it claims were due and owing on sales that it actually made under the SOA.