COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |  |
|---|---|---|
| JOY B. ADAMS D/B/A ELLYSON ABSTRACT & TITLE CO., and ELLYSON ABSTRACT & TITLE CO., L.L.C., | § § § | No. 08-07-00071-CV |
|  | § | Appeal from |
| Appellants, | § | 112thDistrict Court |
| v. | § | of Pecos County, Texas |
| DAVID BRUCE McFADDEN AS INDEPENDENT EXECUTOR OF THE ESTATE OF FREIDA H. McFADDEN, DECEASED, | § § § | (TC # P-10314-112-CV) |
|  | § |  |
| Appellee. |  |  |

**O P I N I O N**

Joy B. Adams and Ellyson Abstract & Title Company, L.L.C. appeal from a judgment

rendered in favor of David Bruce McFadden as Independent Executor of the Estate of Freida H.

McFadden.[1]  We affirm the judgment with regard to liability and damages.  We reverse that portion

of the judgment awarding attorneys' fees and remand for a new trial on that issue.

**FACTUAL SUMMARY**

In1982 or 1983, Freida McFadden purchased Ellyson Abstract and Title Company with

offices located in Fort Stockton and Alpine, Texas.  For the majority of this time period, it was the

only title company in Fort Stockton.  Joy Adams worked for Freida in the Alpine office for two or

three years and Frieda sold Joy the Alpine office in 1986 or 1987.  In 1999, Joy discussed purchasing

---

[1]  The opinion will refer to the appellants collectively as "Appellants" and to Joy Adams by her first name. Likewise, we will refer to the appellee as "McFadden" and to the individuals, Frieda McFadden and Bruce McFadden, by their first names.

the Fort Stockton office for $300,000 but the transaction was not consummated. Around November 2000, Joy learned through a third party that Frieda wanted to sell the Fort Stockton company for $150,000. Joy called Frieda and agreed to purchase Ellyson Abstract for that price. Joy contacted an attorney Frieda had recommended to draft the documents. On December 22, 2000, Joy and Frieda executed an Improved Property Commercial Contract conveying the real property to Joy and her husband, E.P. "Apache" Adams, for the purchase price of $150,000. On January 5, 2001, Frieda executed a bill of sale conveying to Joy and Apache all of the personal property situated at the offices of Ellyson Abstract & Title Company in Fort Stockton, including but not limited to "all furniture, fixtures, computers including all soft ware and any records contained in the hard drive, all files, all card files of legal transactions, typewriters, calculators, adding machines, copiers, telephones, all office supplies, and any and all other personal property situated at the location of Ellyson Abstract and Title Company." At the time of sale, there were two title insurance commitments with pending closings. These commitments related to large tracts of land and were referred to as the "Windfarm Projects." One was referred to as the Chicago Abstract Project and the other as the Stewart Title Project. Only the Stewart Title project eventually closed through Ellyson Abstract.

McFadden alleged--and the jury found--that Frieda and Joy had an oral agreement that Frieda would receive the proceeds from the two pending title commitments because they had been written before the sale. In the year following Joy's purchase of the business, Ellyson Abstract & Title Co., L.L.C., received $416,475.30 from the Stewart Title deal. Joy did not notify Frieda that the money had been received and she threatened the employees at Ellyson Abstract with termination if any of them informed Frieda about it. Frieda's attorney wrote a letter to Joy demanding that she pay her the proceeds received on the Windfarm Project, but Joy did not do so. Frieda died on July 19, 2003 and her son, Bruce McFadden, in his capacity as executor of his mother's estate, filed suit against Joy

Adams, E.P. Adams, and Ellyson Abstract & Title Company, L.L.C., asserting claims for breach of contract, conversion, breach of fiduciary duty, and common law fraud. A jury found in McFadden's favor on the breach of contract, breach of fiduciary duty and conversion claims but found in favor of Joy on the fraud claim. The jury awarded actual damages in the amount of $169,036.32 and reasonable attorneys' fees in the amount of $205,000. The jury also found that Joy intentionally breached her fiduciary duty, but it did not award exemplary damages. The trial court entered judgment in favor of McFadden based on the jury's verdict.

## ILLEGALITY

In Issue One, Appellants contend that an oral agreement requiring Joy to pay the proceeds from the premium issued on the title policy is illegal as a matter of law because at the time the proceeds were received Frieda no longer had a license to conduct insurance business, and therefore, Joy could not legally pay her the premium. For the same reason, Appellants also argue that the contract is unenforceable as a matter of law.

At the conclusion of McFadden's case-in-chief, Appellants moved for an instructed verdict on the ground that the oral contract, if it existed, was illegal. In support of their motion, Appellants asked the trial court to take judicial notice of their motion for summary judgment and the attached records from the Texas Department of Insurance showing that the licenses of Ellyson Abstract were cancelled on June 14, 2001 and Frieda's license was cancelled on June 22, 2001.[2] The court inquired why it should take judicial notice and asked Appellants whether they wished to introduce the evidence before the jury. Appellants insisted it was a question of law. The trial court did not affirmatively take judicial notice but simply instructed counsel to proceed. The court overruled the motion for

---

[2] The record before us does not reflect whether the trial court ruled on the motion for summary judgment.

instructed verdict on the ground of illegality.

Appellants did not request the submission of any questions to the jury on their affirmative defense of illegality[3] or their defense of impossibility of performance. Appellants raised the issue again in their motion for new trial. In the section of their motion challenging the legal and factual sufficiency of the evidence supporting the jury's finding that Joy breached the oral agreement, Appellants stated: "As a matter of law, Joy Adams could not share proceeds of a title insurance premium with Freida McFadden and could not therefore have breached any agreement which may have existed. As more fully stated in Defendants' Motion for Summary Judgment, any such agreement is rendered void because such a contract would violate the law and by the doctrine of impossibility." Appellants also filed a motion for judgment notwithstanding the verdict. Citing Sections 2502.051[4] and 2502.053[5] of the Texas Insurance Code, they alleged that McFadden's causes of action were "barred as a matter of law" because any oral agreement for Joy to pay Frieda proceeds from the title policies was void and unenforceable. The trial court overruled both motions.

The validity of a contract is generally a question of law. *Farah v. Mafrige & Kormanik, P.C.*, 927 S.W.2d 663, 678 (Tex. App.--Houston [1st Dist.] 1996, no writ). An illegal contract is one in which the parties undertake what the law forbids. *Franklin v. Jackson*, 847 S.W.2d 306, 309 (Tex.App.--El Paso 1992, writ denied). A contract to do a thing which cannot be performed without

---

[3] Illegality is an affirmative defense. TEX.R.CIV.P. 94.

[4] Section 2502.051 of the Texas Insurance Code provides that "[a] commission, rebate, discount, portion of a title insurance premium, or other thing of value may not be directly or indirectly paid, allowed, or permitted by a person engaged in the business of title insurance or received or accepted by a person for engaging in the business of title insurance or for soliciting or referring title insurance business." TEX.INS.CODE ANN. § 2502.051 (Vernon 2009).

[5] Section 2502.051 does not prohibit: (1) payment for services actually performed by a title insurance company, title insurance agent, or direct operation in connection with title examination or with closing the transaction or furnishing title evidence if: (A) the payment does not exceed the percentage of premium or other amount established by the commissioner for the payment; and (B) the person receiving the payment is licensed as provided by this title. TEX.INS.CODE ANN. § 2502.053(1)(Vernon 2009).

a violation of the law is void. *Id.* Because the contract violates the law, it imposes no legal obligation on the parties. *Miller v. Long-Bell Lumber Co.*, 148 Tex. 160, 222 S.W.2d 244, 246 (Tex. 1949); *Franklin*, 847 S.W.2d at 309. However, a contract which could have been performed in a legal manner will not be declared void simply because it may have been performed in an illegal manner. *Franklin*, 847 S.W.2d at 309, *citing Lewis v. Davis*, 145 Tex. 468, 199 S.W.2d 146, 148-49 (1947); *Wade v. Jones*, 526 S.W.2d 160, 162-63 (Tex.Civ.App.--Dallas 1975, no writ). The law presumes that contracts are legal, and the burden to prove illegality is on the party asserting it, in this case, Appellants. *See Franklin*, 847 S.W.2d at 310. Unless the face of the contract shows it is illegal, the party asserting illegality must present evidence demonstrating the illegality before a court may declare the contract void. *See Lewis*, 199 S.W.2d at 149; *Franklin*, 847 S.W.2d at 310.

We begin with the presumption that the contract is legal. Appellants did not introduce any evidence establishing that the contract was illegal at the time it was made. Nor do they allege that Frieda did not hold the appropriate licenses at the time of the oral agreement that Joy would pay her the proceeds received from the two Windfarm Projects. Because the contract could have been performed in a legal fashion at the time it was made, Appellants had the burden to introduce evidence proving illegality. This they failed to do. We overrule Issue One.

## UNENFORCEABILITY

In their second issue, Appellants maintain that the oral agreement is unenforceable because the written agreement is unambiguous and constitutes the entire agreement of the parties. Appellants contend that Joy acquired the right to the premiums earned from the windmill projects when she purchased the business because Frieda conveyed the "files" to her as part of the transaction, which included the right to those premiums. In their reply brief, Appellants have expanded upon this argument. Pointing to an integration clause in the written contract, they allege that the oral

agreement is unenforceable and the written agreement must be enforced as written and cannot be added to or varied by parol evidence.

The parol evidence rule is a rule of substantive contract law, not evidence. *Hubacek v. Ennis State Bank*, 159 Tex. 166, 317 S.W.2d 30, 31 (1958); *DeClaire v. G & B McIntosh Family Limited Partnership*, 260 S.W.3d 34, 45 (Tex.App.--Houston [1st Dist.] 2008, no pet. h.). We review parol evidence questions *de novo*, as questions of law. *DeClaire*, 260 S.W.3d at 45.

When the parties have concluded a valid, integrated agreement, the parol evidence rule precludes enforcement of a prior or contemporaneous inconsistent agreement. *Edascio, L.L.C. v. NextiraOne L.L.C.*, 264 S.W.3d 786, 796 (Tex.App.--Houston [1st Dist.] 2008, pet. filed); *ISG State Operations, Inc. v. National Heritage Insurance Company*, 234 S.W.3d 711, 719 (Tex.App.-- Eastland 2007, pet. denied). The execution of a written contract presumes that all prior negotiations and agreements relating to the transaction have been merged into the written contract. *Edascio*, 264 S.W.3d at 796; *ISG State Operations*, 234 S.W.3d at 719. Consequently, the agreement will be enforced as written and cannot be added to, varied, or contradicted by parol evidence. *Edascio*, 264 S.W.3d at 796; *ISG State Operations*, 234 S.W.3d at 719. The parol evidence rule is particularly applicable when the written contract contains a recital that it contains the entire agreement between the parties or a similarly-worded merger provision. *Edascio*, 264 S.W.3d at 796. Evidence that violates the rule is incompetent and without probative force, and cannot properly be given legal effect. *Garner v. Fidelity Bank, N.A.*, 244 S.W.3d 855, 859 (Tex.App.--Dallas 2008, no pet.).

Parol evidence may be admissible to show collateral, contemporaneous agreements that are consistent with the underlying agreement. *Gary E. Patterson & Associates, P.C. v. Holub*, 264 S.W.3d 180, 197 (Tex.App.--Houston [1st Dist.] 2008, pet. denied); *DeClaire*, 260 S.W.3d at 45. But this exception does not permit parol evidence that varies or contradicts either the express terms

or the implied terms of the written agreement. *Gary E. Patterson*, 264 S.W.3d at 197; *DeClaire*, 260 S.W.3d at 45. A collateral agreement is one the parties might naturally make separately, i.e., one not ordinarily expected to be embodied in, or integrated with the written agreement and not so clearly connected with the principal transaction as to be part and parcel of it. *Garner*, 244 S.W.3d at 859.

An agreement is integrated if the parties intended a writing to be a final and complete expression of agreed terms. *Morgan Buildings and Spas, Inc. v. Humane Society of Southeast Texas*, 249 S.W.3d 480, 486 (Tex.App.--Beaumont 2008, no pet.). The inclusion of a merger or integration clause does not conclusively establish that the written contract is fully integrated. *Id.* A fully integrated written agreement is a final and complete expression of all the terms agreed upon by the parties. *Id.* A partially integrated agreement is a final and complete expression of all the terms addressed in that written agreement, but is not a final and complete expression of all the terms the parties have agreed upon. *Id.* A court considers the surrounding circumstances in determining whether, and to what degree, an agreement is integrated. *Id.*

Joy and Frieda did not have a written agreement whereby Frieda sold Ellyson Abstract to Joy. Instead, Frieda sold Joy the real property, including improvements, the abstract plant, and the personal property located on the business premises. Joy and Frieda signed the improved property commercial contract on December 22, 2000, whereby Frieda agreed to convey the real property to Joy for $150,000. Section 11 of the contract, entitled "Special Provisions" provided as follows: "This sale shall include the real estate and all improvements located thereon; All equipment, computers, supplies, abstract plant, copiers, fax machines, Seller will net $150,000.00." The contract also included an integration clause in Section 22(C): "This contract contains the entire agreement of the parties and may not be changed except by written agreement."

Despite the real property contract's recitation that it contains the entire agreement of the

parties, it did not set forth all the terms of the sale and transfer of personal property. On January 5, 2001, Frieda executed a "Bill of Sale" which recited the sale of certain personal property to E.P. Adams and Joy B. Adams, effective January 30, 2001. The Bill of Sale includes the following description of the property:

> All of the personal property situated at the offices of Ellyson Abstract and Title Company at 117 South Main, Fort Stockton, Pecos County, Texas, 79735 . . . including but not limited to all furniture, fixtures, computers including all soft ware and any records contained in the hard drive, all files, all card files of legal transactions, typewriters, calculators, adding machines, copiers, telephones, all office supplies, and any and all other personal property situated at the location of Ellyson Abstract and Title Company.

The Bill of Sale sets forth the terms of the personal property transferred from Frieda to Joy and it listed items that were not included in the real property contract. Appellants claim that the orders for title commitments were personal property and were included in the Bill of Sale as "files." A "commitment for title insurance" is defined by the Texas Insurance Code to mean a title insurance form under which a title insurance company offers to issue a title insurance policy subject to stated exceptions, requirements, and terms. TEX.INS.CODE ANN. § 2701.001(a)(Vernon 2009). A commitment for title insurance constitutes a statement of the terms and conditions on which a title insurance company is willing to issue its policy. TEX.INS.CODE ANN. § 2701.001(b)(Vernon 2009). The real property contract and the bill of sale are silent with respect to the right to the premiums from the Windfarm Projects, neither of which had closed at the time of the sale. In support of their argument that "files," as used in the Bill of Sale, meant orders for commitments, Appellants point to the testimony of Brenda Faubion, a former employee of Ellyson Abstract. During Appellants' cross-examination, counsel asked Faubion what makes up a title plant, and she responded "[t]he records, the equipment, the files." She explained that an abstract plant is comprised of the records which show property title. The following exchange then occurred:

[Appellants' counsel]:  What do you mean by 'files'?

[Faubion]:  I mean the existing files that were left there.

[Appellants' counsel]:  People that had asked for commitments.  Right?

[Faubion]:  Right.

[Appellants' counsel]:  Pending work.  Right?

[McFadden's counsel]:  Object as to form.

[Appellants' counsel]:  Pending work.  Right?

[Faubion]:  Yes.

Faubion's testimony as to the meaning of the term "files" is incompetent parol evidence because Appellants, who have asserted throughout trial and appeal that the contracts are unambiguous, offered it to explain the meaning of the term "files" in the Bill of Sale.  *Swinnea v. ERI Consulting Engineers, Inc.*, 236 S.W.3d 825, 835 (Tex.App.--Tyler 2007, pet. filed)(parol evidence rule prohibits the admission of extrinsic evidence to vary or explain the terms or contradict the legal effect of an unambiguous written instrument in the absence of a showing of fraud, accident, or mistake in its preparation).

Even if Faubion's testimony on the subject of the meaning of the term "files" is competent evidence, it does not address who had the right to the premiums.  There is no language in the real property contract or the bill of sale by which Frieda unambiguously expressed an intent to transfer to Joy the right to the premiums from the Windfarm Projects as part of the sale.  Considering the surrounding circumstances, we conclude that the real property contract is only partially integrated because it does not fully address the transfer of personal property and it does not address at all the right to the premiums from the pending title commitment orders.  McFadden's expert witness, Bert Massey, expressed an expert opinion that he would have expected the contract between the parties

to address accounts receivable, accounts payable, and work in progress, but it did not. He went on to explain that he would have expected the parties to have an agreement pertaining to outstanding obligations of Ellyson Abstract, to income that the seller expected to receive but which had not yet been received, and what value to place on transactions in progress that had not yet closed. Referring to the two outstanding orders for title commitments, Massey expected to see something in an agreement relating to what compensation, if any, the prior owner would receive for the work that was done but not paid for up until the time the transaction closed.

The parties' oral agreement that Joy would pay Frieda the premiums when the Windfarm Projects closed does not contradict the written agreement. Therefore, the evidence regarding the oral contract is competent evidence and the oral contract does not violate the merger doctrine. Issue Two is overruled.

## SUFFICIENCY OF THE EVIDENCE

In Issue Three, Appellants challenge the legal and factual sufficiency of the evidence supporting the jury's finding that Joy Adams entered into an oral agreement with Frieda McFadden to pay her the proceeds resulting from title policies issued in connection with the Windfarm Projects.

### *Legal Sufficiency*

A "no evidence" or legal insufficiency point is a question of law which challenges the legal sufficiency of the evidence to support a particular fact finding. *Serrano v. Union Planters Bank*, *N.A.*, 162 S.W.3d 576, 579 (Tex.App.--El Paso 2004, pet. denied). There are two separate "no evidence" claims. *Id*. When the party having the burden of proof suffers an unfavorable finding, the point of error challenging the legal sufficiency of the evidence should be that the fact or issue was established as "a matter of law." *Id*. When the party without the burden of proof suffers an unfavorable finding, the challenge on appeal is one of "no evidence to support the finding." *Id*.; *In*

*re Estate of Livingston*, 999 S.W.2d 874, 879 (Tex.App.--El Paso 1999, no pet.). In this case, McFadden had the burden to prove the existence of the oral contract.

An appellate court will sustain a legal sufficiency or "no-evidence" challenge if the record shows: (1) the complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *El Paso Independent School District v. Pabon*, 214 S.W.3d 37, 41 (Tex.App.--El Paso 2006, no pet.). In conducting our review, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *City of Keller*, 168 S.W.3d at 822. Even if evidence is undisputed, it is the province of the trier of fact to draw from it whatever inferences it wishes so long as more than one inference is possible. *Id*. at 821. But if the evidence allows only one inference, neither the trier of fact nor the reviewing court may disregard it. *Id*. at 822. We are also mindful that the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Id*. at 819. When there is conflicting evidence, it is the province of the trier of fact to resolve such conflicts. *Id*. at 820. In every circumstance in which a reasonable trier of fact could resolve conflicting evidence either way, the reviewing court must presume it did so in favor of the prevailing party, and disregard the conflicting evidence in its sufficiency review. *Id*. at 821. If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then the trier of fact must be allowed to do so. *Id*. at 822. So long as the evidence falls within this zone of reasonable disagreement, we may not substitute our judgment for that of the trier-of-fact. *Id*. The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *Id*. at 827.

Despite Joy's denial that an oral agreement existed, there is evidence from which the jury could have found Joy agreed to pay Frieda the premiums from the Windfarm Projects. Before his mother died, Bruce McFadden asked employees at Ellyson Abstract on several occasions whether the Windfarm Projects had closed. Each time, the employees said they had not. While driving along I-10 in July 2002, Bruce saw that the windfarm had gone up. Consequently, he called Joy and asked her if the Windfarm Projects had closed. She said they had, and Bruce asked when his mother was going to get her money. Joy replied, "I've been beating myself about the head and shoulders trying to figure out a way to get her paid." Joy revealed that she had been speaking to the Texas Insurance Commission and they would not allow Joy to pay her. Bruce told Joy that it was his mother's retirement money and she was counting on it. He then asked Joy whether she had used his mother's money to buy the new $65,000 Cadillac Escalade he had seen sitting in the parking lot. Joy replied, "Bruce, I haven't spent one dime of your mother's money on that car." Bruce told Joy he would call her the next day and they hung up. Bruce called her a couple of days later and Joy advised him that she had an attorney and Bruce should call him. Bruce also testified that after the sale of Ellyson Abstract, his mother had retained an Ellyson Abstract escrow account to receive the premiums from the Windfarm Projects. According to him, there would have been no other reason for her to keep an escrow account. His mother kept the account open until the day she died.

Jack McIntyre, an independent businessman, spoke with Frieda in July or August of 2000 about purchasing Ellyson Abstract. Frieda said the sale would include the building and the business but she clearly indicated to him that she would retain two "windmill contracts." She did not specifically tell McIntyre what the contracts were worth but he understood that it was a substantial amount of money. McIntyre did not purchase the business because he could not afford it at the time.

Brenda Faubion worked for both Frieda and Joy at Ellyson Abstract. On March 30, 2001,

Ellyson Abstract remitted two cashier's checks to "Freida McFadden dba Ellyson Abstract," one in the amount of $4,405.87 and the other in the amount of $6,567.83. On August 8, 2001, Rosie Causey, an Ellyson Abstract employee, sent a check to Frieda in the amount of $5,631 with the notation "Woodward Mtn TWP-06-03." Causey attached a note which stated, "Frieda, I know this isn't exactly what you were expecting, but we've had to separate the charges for Cielo and Chicago Title. Cielo is paying for their charges but we have not received anything from Chicago." Frieda called Ellyson Abstract and spoke with Faubion about these checks. Faubion told Frieda that Joy had instructed them to send the checks to her. Frieda asked her whether the main part of the transaction had closed and Faubion told her it had not. Frieda said that she was not going to cash the checks because she believed the deal was going to close and she did not want it to appear that she was agreeing to take the lesser amount of money. Frieda indicated to Faubion she expected to receive the money when the deal closed because they had done 90 percent of the work. Approximately six months after the sale of Ellyson Abstract, Faubion spoke with Bruce McFadden. He asked her whether the Windfarm Projects had closed. She told him they had not. Two weeks later, Bruce went to the office and spoke with Faubion about uncashed checks he had found. According to Faubion, some of the checks were for title policy premiums that had been collected after Joy had purchased Ellyson Abstract. Faubion assumed that those checks had not been cashed because they had been misplaced. Three or four other checks were from Cielo Land on the Chicago Title transaction. Faubion knew from her prior conversation with Frieda that she purposely had not cashed those checks. Faubion recalled that after Ellyson Abstract received the money for the Stewart Title policy, Joy told her that she did not know whether she would be able to give Frieda any of the money. Joy explained that she had contacted Stewart Title in San Antonio and they questioned whether it was legal for Joy to disburse any of it to Frieda.

Melody Tijerina, a former employee of Ellyson Abstract, testified that Joy warned the employees if *any* of them told Frieda that the money from the Windfarm Projects had come in, she would fire *all* of them. It was because of this threat that Tijerina never told Frieda that the money had been received. Tijerina knew Joy's threat was related to a condition of the sale of Ellyson Abstract to Joy. Tijerina quit working for Ellyson Abstract in 2001 because of Joy's conduct and she moved to Idaho. Tijerina regretted never telling Frieda that the money from the Windfarm Projects had been received in July of 2001, but she told Bruce in January of 2006 what she knew. Finally, McFadden offered expert testimony to prove the existence of an oral agreement. Bert Massey is a Texas attorney who practices real estate law and has owned a title insurance agency since 1980. Massey is also a licensed escrow officer and is an approved examining attorney of real estate titles for five title insurance underwriting companies who do business in Texas. Massey has qualified as an expert on title insurance in proceedings before the State Insurance Board and State Insurance Commission. In preparation for his testimony, Massey reviewed a large amount of documents, including the order sheets on two potential title insurance transactions and the documents related to the sale of Ellyson Abstract to Joy. He also reviewed McFadden's trial exhibit notebooks. In Massey's opinion, there was an oral agreement between the parties. He based his opinion on the issuance of checks from Ellyson Abstract to Frieda, the former owner. He stated there had to be an agreement relating to some matters that were going to happen after the closing because there would have been no need for the payments to be made after the business was sold. In connection with his review of the documents pertaining to the sale of Ellyson Abstract to Joy, Massey testified that the written contracts did not address accounts receivable, accounts payable, and work in progress. He explained that he would have expected the parties to have an agreement pertaining to outstanding obligations of Ellyson Abstract, to income that the seller expected to receive but which

had not yet been received, and what value to place on transactions in progress that had not yet closed. Referring to the two outstanding orders for title commitments related to the Windfarm Projects, Massey expected to see something in an agreement relating to what compensation, if any, the prior owner would receive for the work that was done but not paid for up until the time the transaction closed. The written agreements did not address any of these matters. Massey concluded that the parties must have had an oral agreement because Ellyson Abstract paid monies to Frieda after the sale. In his thirty-six years in the title insurance business, Massey had never worked on any title commitments as valuable as the Windfarm Projects. In his opinion, there was no question that most rural title insurance companies would consider these to be the deals of a lifetime.

In addition to expert testimony, there was other evidence relevant to the existence of an oral contract. Frieda offered to sell the business to Jack McIntyre but made clear to him that the sale would not include the Windfarm Projects. Joy purchased the business for one-half of the price she had been quoted two years earlier. After purchasing Ellyson Abstract, Joy threatened to fire her employees if any of them told Frieda that Ellyson Abstract had received the money from the Windfarm Projects. Melody Tijerina knew that Joy's threat was related to a condition of the sale of Ellyson Abstract. Joy had Ellyson Abstract employees forward checks to Frieda several months after the sale. After Ellyson Abstract received the proceeds from the Stewart Title deal, Joy told Brenda Faubion that she did not know whether she would be able to give the money to Frieda. This is contrary to her position at trial that Frieda did not retain any right to the premiums when she sold the business. Similarly, when Bruce McFadden called Joy in July 2001 about the closing of the Windfarm Projects and his mother's money, Joy did not indicate any surprise or disagreement that Frieda expected to receive money in connection with the closing of the Windfarm Projects but instead said she was trying to figure out a way for his mother to get "her money." When Bruce asked Joy

whether she had purchased a new vehicle with his mother's money, Joy again referred to the money as Frieda's money and insisted she had not spent one penny of "your mother's money." When viewed in the light most favorable to the verdict, the foregoing evidence supports a conclusion that Frieda retained the right to the premiums from the Windfarm Projects when she sold the business to Joy, and Joy and Frieda had an oral agreement that Frieda would receive the premiums when Windfarm Projects closed.

*Factual Sufficiency*

In reviewing a challenge to the factual sufficiency of the evidence supporting a vital fact, we must consider, weigh, and examine all of the evidence in the record, both supporting and against the finding, to decide whether the verdict should be set aside. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). When a party attacks the factual sufficiency of an adverse finding on an issue on which the opposing party has the burden of proof, we should set aside the verdict only if the evidence supporting the jury finding is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We are not permitted to substitute our judgment for that of the jury. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761-62 (Tex. 2003). Further, we bear in mind that the jury is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *Id.*

As noted in our discussion of the legal sufficiency challenge, Joy denied the existence of an oral agreement. Appellants challenged the credibility of the witnesses who testified in support of a finding that an oral agreement existed. Joy explained that the two checks sent to Frieda in March 2001 were funds Frieda left in Ellyson Abstract's escrow account. She said Frieda was entitled to the check issued by Cielo Land in connection with the Chicago Title deal because it was a reimbursement for her expenses. It was the jury's task to determine credibility and resolve conflicts

in the evidence.  The record does not demonstrate that the evidence supporting the jury's finding is so weak as to be clearly wrong and manifestly unjust.  We overrule Issue Three.

## CONVERSION AND BREACH OF FIDUCIARY DUTY

In Issues Four and Five, Appellants raise sufficiency challenges to the jury's findings on the conversion and breach of fiduciary duty causes of action. It is unnecessary to address these issues because the jury's finding on the breach of contract cause of action will support the judgment.

## CHARGE ERROR

In Issue Six, Appellants assert that the trial court failed to instruct the jury on the various elements of damages recoverable in connection with the breach of contract, breach of fiduciary duty and conversion causes of action.[6] Question 7 in the court's charge asked the following:

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate *The Estate of Frieda McFadden* for its damages, if any, for the conduct described in Questions 2, 4, 5, or 6?

The instructions accompanying this question did not include any instructions on the proper measure of damages.

Damages must be measured by a legal standard and that standard must be used to guide the fact finder in determining what sum would compensate the injured party. *Jackson v. Fontaine's Clinics, Inc.*, 499 S.W.2d 87, 90 (Tex. 1973). A jury question which fails to guide the jury on any proper legal measure of damages is fatally defective. *Id.* To preserve error, the complaining party must object to the charge and tender the instructions in substantially correct form. TEX.R.CIV.P.

---

[6] In their reply brief, Appellants contend the trial court failed to submit separate damages questions for each cause of action. Citing *Harris County v. Smith*, 96 S.W.3d 230 (Tex. 2002), Appellants argue that the error is harmful because the single broad-form damages question included both valid and invalid measures of damages. Appellants did not raise these arguments in their initial brief but instead restricted their complaint to the absence of an instruction on the proper measure of damages. The Rules of Appellate Procedure do not allow an appellant to include in a reply brief a new issue not raised by its original brief. TEX.R.APP.P. 38.3. Accordingly, we will not address the arguments raised for the first time in the reply brief. *See Few v. Few*, 271 S.W.3d 341, 346-47 (Tex.App.--El Paso 2008, pet. struck)(issue raised for the first time in reply brief was not preserved for appeal); *Gray v. Woodville Health Care Center*, 225 S.W.3d 613, 620 (Tex.App.--El Paso 2006, pet. denied)(issue raised for the first time in reply brief was not preserved for appeal).

278;[7] *Jim Howe Homes, Inc. v. Rogers*, 818 S.W.2d 901, 903 (Tex.App.--Austin 1991, no writ). While Appellants objected at the charge conference that Question 7 did not include instructions on the measure of damages for the various legal theories, they did not submit in writing a request for an instruction. Consequently, this issue is waived. We overrule Issue Six.

## SEGREGATION OF ATTORNEYS' FEES

In Issue Seven, Appellants argue that McFadden failed to segregate attorneys' fees. A party seeking attorneys' fees must show that the fees were incurred on a claim that allows recovery of such fees, and thus is ordinarily required to segregate fees incurred on claims allowing recovery of fees from those that do not. *Stewart Title Guaranty Company v. Aiello*, 941 S.W.2d 68, 73 (Tex. 1997). There is an exception to this rule.[8] When discrete legal services advance both recoverable claims and unrecoverable claims, attorneys are not required to segregate fees to recover the total amount covering all claims. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d at 299, 313 (Tex. 2006); *CA Partners v. Spears*, 274 S.W.3d 51, 81 (Tex.App.--Houston [14th Dist.] 2008, pet. denied). In *Tony Gullo Motors*, the Supreme Court eliminated the exception to the segregation requirement for fees incurred solely on a separate but intertwined claim. *Tony Gullo Motors*, 212 S.W.3d at 313-14. If any attorneys' fees relate solely to a claim for which such fees are unrecoverable, the claimant must segregate recoverable from unrecoverable fees. *Id.* at 313. This standard does not require attorneys to keep separate time records when they draft the breach of contract and fraud paragraphs of a

---

[7] Rule 278 provides: "Failure to submit a definition or instruction shall not be deemed a ground for reversal of the judgment unless a substantially correct definition or instruction has been requested in writing and tendered by the party complaining of the judgment."

[8] Prior to the Supreme Court's decision in *Tony Gullo Motors*, the exception applied when two or more claims were dependent upon the same set of facts or circumstances and thus were intertwined to the point of being inseparable. *See Tony Gullo Motors*, 212 S.W.3d at 311 (discussing exception created by *Stewart Title Guaranty Company v. Sterling*, 822 S.W.2d 1, 11-12 (Tex. 1991). Courts referred to the claims as being "inextricably intertwined" and fee segregation was not required. *See Tony Gullo Motors*, 212 S.W.3d at 311. Noting that the exception threatened to swallow the rule, the Supreme Court eliminated this formulation of the exception. *Id.*, 212 S.W.3d at 312-13.

petition. *See id.* at 314. The amount of recoverable attorneys' fees is sufficiently segregated if, for example, the attorney testifies that a given percentage of the drafting time would have been necessary even if the claim for which attorneys' fees are recoverable had not been asserted. *Id.* at 314; *see CA Partners*, 274 S.W.3d at 82; *7979 Airport Garage, L.L.C. v. Dollar Rent A Car Systems, Inc.*, 245 S.W.3d 488, 509 (Tex.App.--Houston [14th Dist.] 2007, pet. denied). The need to segregate attorneys' fees is a question of law, while the extent to which claims can or cannot be segregated is a mixed question of law and fact. *Tony Gullo Motors*, 212 S.W.3d at 312-13; *CA Partners*, 274 S.W.3d at 82.

McFadden asserts that Appellants waived the error by failing to object to counsel's testimony on attorney's fees. Appellants preserved their complaint by objecting to the charge. *See Hong Kong Development, Inc. v. Nguyen*, 229 S.W.3d 415, 454 (Tex.App.--Houston [1st Dist.] 2007, no pet.)(objection to charge preserved error related to unsegregated attorney's fees); *Young v. Neatherlin*, 102 S.W.3d 415, 420 (Tex.App.--Houston [14th Dist.] 2003, no pet.)(holding that objection to charge preserved challenge, even though party had not objected to testimony on unsegregated fees); *see also McCalla v. Ski River Dev., Inc.*, 239 S.W.3d 374, 383 (Tex.App.--Waco 2007, no pet.)(to preserve complaint that the opposing party failed to segregate its attorney's fees, "[g]enerally, such an issue is preserved by objection during testimony offered in support of attorney's fees or an objection to the jury question on attorney's fees").

We turn now to the issue of whether McFadden was required to segregate. McFadden argues that Appellants failed to ask any questions during cross-examination regarding the need to segregate. Appellants were not required to cross-examine on the issue because it was McFadden's burden to prove that fee segregation is not required. *See CA Partners*, 274 S.W.3d at 82. It cannot be disputed that a portion of counsel's time was spent drafting the pleadings related to the tort claims. While

McFadden might argue that this time is nominal, unrecoverable fees are not rendered recoverable merely because they are nominal. *See Tony Gullo Motors*, 212 S.W.3d at 313; *CA Partners*, 274 S.W.3d at 84. Consequently, we find that McFadden was required to segregate. *See CA Partners*, 274 S.W.3d at 84. We sustain Issue Seven. McFadden did not forfeit his right to recover attorney's fees by failing to segregate them because the evidence he presented regarding the total amount constitutes some evidence of what the segregated amount should be. *See Tony Gullo Motors*, 212 S.W.3d at 314; *CA Partners*, 274 S.W.3d at 84. Therefore, a remand for a new trial on recoverable attorney's fees is the appropriate remedy. *Id.*

### ADMISSION OF EXPERT TESTIMONY

In Issue Eight, Appellants contend that the trial court abused its discretion by admitting the expert testimony of Bert Massey. There are two parts to this issue. First, Appellants assert that Massey's opinion on this subject was not disclosed during discovery. Second, Appellants argue that Massey's opinion on this subject is unreliable. We will address the latter issue first.

Whether to admit or exclude evidence is within the trial court's sound discretion. *National Liability and Fire Insurance Company v. Allen*, 15 S.W.3d 525, 527 (Tex. 2000). Accordingly, we review the admission of expert testimony for an abuse of discretion. *Helena Chemical Company v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001). The trial court abuses its discretion when its ruling is arbitrary, unreasonable, or without reference to any guiding rules or legal principles. *K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000).

*Reliability*

Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

TEX.R.EVID. 702. For an expert's testimony to be admissible, the expert must be qualified and the expert's opinion must be relevant to the issues in the case and based upon a reliable foundation. *Exxon Pipeline Company v. Zwahr*, 88 S.W.3d 623, 628 (Tex. 2002); *Helena Chemical Company v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001).

Appellants have not challenged Massey's qualifications as an expert or the relevance of his testimony. They assail only one aspect of his testimony, namely, his conclusion that an oral agreement existed, and they contend that his conclusion is unreliable. Unreliable evidence is of no assistance to the trier of fact and is therefore inadmissible under Rule 702. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995); *Greenberg Traurig of New York, P.C. v. Moody*, 161 S.W.3d 56, 93 (Tex.App.--Houston [14th Dist.] 2004, no pet.). The reliability requirement focuses on the principles, research, and methodology underlying an expert's conclusions. *Zwahr*, 88 S.W.3d at 629. But because it is impossible to set the criteria for evaluating the reliability of expert testimony in non-scientific cases such as this, it is within the trial court's discretion to determine how to assess reliability. *Greenberg Traurig of New York, P.C. v. Moody*, 161 S.W.3d at 93.

Appellants assert that Massey's opinion is unreliable because it is based on the existence of payments to Frieda after the sale and there were other explanations for those payments, including that some of the payments were from Frieda's own escrow account. Those were not the only payments

made to Frieda and the existence of the payments was not the only basis for Massey's opinion. By virtue of his experience, Massey was familiar with the operations of a title company and with what is involved when such a business is sold. Massey found it unusual that the written documents did not address accounts receivable, accounts payable, and work in progress. He would have expected the parties to have an agreement pertaining to outstanding obligations of Ellyson Abstract, to income that the seller expected to receive but which had not yet been received, and what value to place on transactions in progress that had not yet closed. Under these circumstances, Massey concluded that there must have been an oral agreement. We find no abuse its discretion in the trial court's determination that Massey's testimony was reliable.

*Failure to Supplement Discovery Response*

Appellants also complain that Massey's opinion on the existence of an oral agreement should have been excluded because McFadden did not disclose it. A party must disclose a testifying expert's mental impressions and opinions and any methods used to derive them. TEX.R.CIV.P. 192.3(e)(4). A party may request disclosure of the general substance of the testifying expert's mental impressions and opinions and a brief summary of the basis for them. TEX.R.CIV.P. 194.2(f)(3). The Rules of Civil Procedure impose on a party an ongoing duty to supplement or amend its discovery responses. *See* TEX.R. CIV. P. 193.5. Under Rule 193.6(a):

> A party who fails to make, amend, or supplement a discovery response in a timely manner may not introduce in evidence the material or information that was not timely disclosed, or offer the testimony of a witness (other than a named party) who was not timely identified, unless the court finds that:
>
> (1) there was good cause for the failure to timely make, amend, or supplement the discovery response; or
>
> (2) the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties.

Tᴇx.R.Cɪᴠ.P. 193.6(a).

McFadden disclosed in a supplemental discovery response that Massey would testify "to the factors, customs and practices generally involved in developing, assessing and conveying the assets of an abstract plant, as well as his opinions as to the reasonable considerations and practical implementation of transfer of files and accounting for premiums when an abstract plant is being conveyed, especially as these factors apply to the facts of this case." This broad designation certainly covered Massey's testimony regarding what he expected to see in an agreement conveying an abstract plant. Massey expected the parties to have an agreement pertaining to outstanding obligations of Ellyson Abstract, to income that the seller expected to receive but which had not yet been received, and what value to place on transactions in progress that had not yet closed. Although it was not specifically stated, Massey's conclusion that the parties had an oral agreement about these matters falls within the disclosure. The trial court did not abuse its discretion by overruling Appellants' objection and admitting the testimony. Issue Eight is overruled.

## LIABILITY OF ELLYSON ABSTRACT

In their final issue, Appellants complain that the trial court erred by entering judgment against Ellyson Abstract & Title Company, L.L.C. because there was no evidence or insufficient evidence showing that it was liable to McFadden. Appellants contend that the pleadings and evidence do not support piercing the corporate veil. They additionally assert that Ellyson Abstract & Title Company, L.L.C. is a limited liability *company*, not a limited liability *corporation.*

In the original petition, McFadden named as defendants Joy B. and E. P. Adams[9] d/b/a Ellyson Abstract & Title Co. Appellants indicated in a discovery response that "Ellyson Abstract & Title L.L.C." is a potential party to the suit. McFadden amended the petition to include Ellyson Abstract

---

[9] The claims against E. P. Adams were dismissed.

& Title Co., L.L.C. as a defendant. The petition alleged that Ellyson Abstract & Title Co., L.L.C. is a limited liability corporation licensed to do business in Texas. Contrary to Appellants' contention on appeal that Ellyson Abstract is a limited liability *company*, Joy testified that Ellyson Abstract & Title Co., L.L.C. is a limited liability *corporation* and she is the president and sole stockholder. She formed the L.L.C. in 1999 prior to purchasing Ellyson Abstract from Frieda. According to Joy, the L.L.C. owns the abstract plant and the equipment while she and her husband personally own the building. The evidence at trial showed that the L.L.C. received the premiums from the Stewart Title project.

A person's status as a vice-principal of the corporation is sufficient to impute liability to the corporation. *GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 618 (Tex. 1999); *DaimlerChrysler Ins. Co. v. Apple*, 265 S.W.3d 52, 64 (Tex.App.--Houston [1st Dist.] 2008, pet. filed). Corporations can act only through their agents. *GTE Southwest*, 998 S.W.2d at 618. A vice-principal represents the corporation in its corporate capacity. *Id*. When actions are taken by a vice-principal of a corporation, those acts may be deemed to be the acts of the corporation itself. *Id.* A vice-principal encompasses four classes of corporate agents: (a) corporate officers; (b) those who have authority to employ, direct, and discharge servants of the master; (c) those engaged in the performance of nondelegable or absolute duties of the master; and (d) those to whom a master has confided the management of the whole or a department or division of his business. *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 391 (Tex. 1997). Courts use the vice-principal doctrine to distinguish between the acts of the corporation itself and that of a mere servant or employee. *Id.* Acts of a "mere servant or employee" are the basis for corporate liability based on the doctrine of *respondeat superior*. *Id.* The liability of the master for the negligent acts of his vice principal is placed upon very different grounds, namely, that the negligent acts of the vice principal are the very acts of the

corporation itself. *Id.*

The undisputed evidence established that Joy is a vice-principal of Ellyson Abstract & Title Co., L.L.C , and the monies which McFadden sought to recover were received by the L.L.C. and were not paid to Frieda. Consequently, Joy's acts are the acts of the corporation. The jury's findings are sufficient to impute liability to the L.L.C. We overrule Issue Nine.

Having sustained Issue Seven, we reverse that portion of the judgment awarding attorneys' fees. Finding no other error, we affirm the remainder of the judgment. We remand the cause for trial on the sole issue of attorneys' fees.

July 29, 2009

ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, and Carr, JJ.
Carr, J., not participating